## AMERICAN CHICLE CO.
### v.
## TOPPS CHEWING GUM, Inc.
### No. 51, Docket 22768.

United States Court of Appeals
Second Circuit.

Argued Oct. 16, 1953.

Decided Nov. 20, 1953.

George E. Middleton, Pennie, Edmonds, Morton, Barrows & Taylor, New York City, for appellant.

W. Lee Helms, New York City, for appellee.

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from a final judgment, permanently enjoining it from infringing the plaintiff's trademark, used in the sale of small nuggets of candy covered chewing gum of various flavors; and dismissing the defendant's counterclaim, for the cancellation of the mark. The registration described the mark as follows: "The trade-mark consists of an O shaped figure colored red having a parallelogram of light shade, usually white, extending horizontally from the central right portion of such figure, together with parallel bands, over and under such figure and parallelogram, of a dark color contrasting with that of the parallelogram, as shown in the drawing. The lining on the O shaped figure denotes the red color, and the lining on the bands indicates shading only. No claim is made to the representation of a carton apart from the other features of the mark shown on the drawing." The only issue on the plaintiff's complaint is whether the defendant infringes; the issues on the counterclaim are that the mark is invalid, as it does not serve to distinguish the plaintiff's goods and that the plaintiff has abandoned it. We do not find it necessary to discuss either of these contentions; and the judgment dismissing the counterclaim will be affirmed. The facts were as follows:

Since 1939 the plaintiff has used the trade-mark in suit on cardboard boxes (three and five eights inches by one and three quarters), holding ten or twelve nuggets, the nuggets in each box being of a single flavor. There are a number

of different flavors, each flavor being in a box of a different color. One box is for peppermint nuggets, and on it the color of the "parallel bands over and under" the O "figure and parallelogram" is yellow. The "O shaped figure colored red" appears at the left on all the boxes, its opening being cut through the cardboard so as to show some of the nuggets within. The "parallelogram of light shade"—in practice always white—bears the word "Chiclets," written in large black letters, and is the most arresting feature of the "make-up" as a whole. In later boxes the "parallelogram of light shade" has been extended far enough to the left to break the circle of the "O shaped figure," and change it into a sort of "C." Up to 1949 the defendant had been selling similar chewing gum nuggets of peppermint flavor in packages, each containing about two nuggets, several packages being inclosed in, and sold from, a containing canister. The "make-up" of these packages was altogether unlike the plaintiff's; but in 1949 it began to market its peppermint nuggets by the dozen in boxes (four inches by two), that have at their left end a broken "O," the upper half of which is colored green, the lower half red. From the broken "O" a white "parallelogram" extends to the right end of the box, flanked above and below by "parallel bands" of yellow, giving the box a predominant tone of the same shade of that color as the plaintiff's. Upon the white "parallelogram" appears in large letters the word, "Topps," in place of "Chiclets" on the plaintiff's boxes; but there is no other substantial difference between the "make-up" of the box except for the defendant's break in the "O" and its upper green half.

Although Judge Byers found no evidence of any "actual confusion on the part of purchasers," he did find that "a brief visual observation by a customer might well fail to apprise him of the different sources of manufacture of the nuggets." Also that "in the usual retail purchase * * * the similarity in appearance * * * is such as to be likely to cause confusion * * * of an appreciable number of ordinarily prudent purchasers." Again, that "the use by the plaintiff of its trade-mark Chiclets * * * does not affect the issues in this case." These findings were supported by the following testimony. The plaintiff's assistant secretary testified on cross-examination as follows:

"Q. Now Mr. Helms has suggested that Chiclets, the word Chiclets, may indicate to some people a candy coated gum. Do you subscribe to that? A. I do.

"Q. Is it your opinion that Chiclets is no longer a good trade-mark? A. It is not my opinion.

"Q. In other words you think it is a good trade-mark? A. I do.

"Q. And you think that to most people it indicates the product of the American Chicle Company, do you not? A. To the majority of people, yes."

The plaintiff's advertising manager testified as follows:

"Q. Have you observed any tendency on the part of the public to call various names (makes?) of candy coated gum Chiclets? A. Very definitely.

"Q. And that has extended over how many years, if any, to your knowledge? A. It has been a problem for many years to our company.

"Q. Have you been in stores or in a store where a customer called for Chiclets? A. Yes.

"Q. More than once? A. On many occasions.

"Q. What have you observed in those instances? A. On occasions a retailer might question the customer by saying 'What kind of Chiclets do you want? Beechies Chiclets? P.K. Chiclets?'"

In contradiction of this testimony Davis, a neutral witness called by the defend-

ant, testified that in his experience, when a buyer asked for "Chiclets," the salesman always gave him the plaintiff's gum; and that he never heard a salesman ask "Do you want P.K. Chiclets or Beechies Chiclets?" He had never "observed that there is a tendency on the part of the public to use the term Chiclets for candy coated gum generally."

Upon this dispute we accept the finding that "the similarity in appearance * * * is likely to cause confusion * * * of an appreciable number of ordinarily prudent purchasers," in spite of the word "Topps" replacing "Chiclets." The situation is therefore one where, although "the majority of people" do not suppose that the word "Chiclets" is generic, there is a "tendency" to read it so; and it follows that to these buyers, who are numerous enough to become "a problem for many years to our company," the word has ceased to denote any definite "source of origin." How far this may have affected the validity of the trade-mark, "Chiclets" (for that too is registered), is not important here. What is important is that to those buyers, who think "Chiclets" to be a descriptive term, the "make-up" that accompanies it may well be what assures them that they were getting the "Chiclets" they have become used to; and the word, "Topps," would not in that event tell them of any new "source of origin." It is reasonable to believe that the fabulous sum—$11,000,000—that has been spent in "publicizing" the plaintiff's nuggets as "Chiclets" has fixed the word in the minds of many buyers as meaning no more than a candy coated gum nugget; and to some degree destroyed it as a trade-mark. That is a peril to which all such advertising is subject; its very success may prove its failure.[1]

We may properly assume, therefore, that, although the defendant's "make-up" is not "likely to cause confusion" among attentive buyers, there is a substantial minority, "likely" to be misled. If we were to read the statute[2] literally, such a minority would be enough, for the text does not limit infringement by the number of those who may be misled. However, we do not read this statute as *tabula rasa;* we construe it in the background of the law as it stood in 1946;[3] and that law defined the issue of infringement less literally. On all but the most extreme occasions it involved a balance of two conflicting interests: that of the "owner" of the mark to prevent the diversion of prospective customers as opposed to that of the putative infringer to be free to compete for them. In the case at bar this becomes a balance between the plaintiff's prospective loss of a not insignificant number of customers—i. e., the more careless ones—and the defendant's interest in continuing the use of a "make-up" that in itself has no conceivable value. For the defendant has not suggested even the most diaphanous reason for selecting for its peppermint box out of all possible permutations of color and design, just the plaintiff's—or at least almost the plaintiff's—combination, except for the substitution of "Topps" for "Chiclets." It would be absurd to see in this anything but a hope to bring to its own net just those buyers who are on the fringe of the plaintiff's possible customers. In the language of Judge Byer, the imitation "revealed an apparent purpose to come as close to the plaintiff's package as the law might close its eyes to, so long as Topps is used instead of Chiclets." What we said in Miles Shoes, Inc., v. R. H. Macy & Co., 2 Cir., 199 F.2d 602, 603, applies to the letter, *mutatis mutandis:* "Why it should have chosen a mark that had long been employed by Macy and had become known to the trade instead of adopting some other means to identify its goods is hard to see unless there was a deliberate purpose to obtain some ad-

1. DuPont Cellophane Co. v. Waxed Products Co., 2 Cir., 85 F.2d 75; Bayer Co. v. United Drug Co., D.C., 272 F. 505.

2. § 1114(1)(a), Title 15, U.S.C.A.

3. S. C. Johnson & Son v. Johnson, 2 Cir., 175 F.2d 176.

vantage from the trade which Macy had built up." Indeed, it is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is "likely" to succeed. Then we feel bound to compel him to exercise his ingenuity in quarters further afield.

The defendant relies upon Life Savers Corp. v. Curtiss Candy Co., 7 Cir., 182 F.2d 4; and it is true that in that case there was evidence that, in spite of the defendant's name, "Curtiss," plainly appearing on its wrapper, there were customers, who bought the defendant's goods, thinking them to be the plaintiff's; moreover, the court, 182 F.2d at page 8, cited a number of decisions to the effect that a new competitor "is not obligated to protect the negligent and inattentive purchaser from confusion resulting from indifference." It cannot be denied that courts have at times reasoned as though a second comer were free to divert a first comer's customers, if he confined himself to those who were unduly careless. If the issue were whether such buyers could complain that they did not get what they wanted, it might be an answer in the second comer's mouth that they had themselves to thank for their failure to look more closely at the "make-up"; though even that is a doubtful answer. Be that as it may, the issue becomes altogether different when it is between a first, and a second comer, for the first comer's careless customers are as valuable to him as any others; and their carelessness can hardly be charged to him. Why they should be deemed more legitimate game for a poacher than his careful buyers, it is hard to see, unless it be on the ground that he should have made his mark so conspicuous that it would serve to hold even the most heedless. Surely that is an inadequate defence. We are not committed to the doctrine in this circuit, and we know of no decision of the Supreme Court that precludes our following our own judgment. We do indeed distinguish the question how far a second comer is to be charged *ab initio* with the duty of anticipating that there will be careless buyers whom his "make-up" may divert. That is one thing; we are speaking of a patent effort to catch such buyers, even though the effort be limited to them. The following excerpts from the Restatement of Torts seem to us, at least by implication, to bear us out. Section 729, Comment f: "But if he" (the second comer) "adopts his designation with the intent of deriving benefit from the trade-mark or trade name his intent may be sufficient to justify the inference that there is confusing similarity * * * his judgment manifested prior to the controversy is highly persuasive. His denial that his conduct was likely to achieve the result intended by him will ordinarily carry little weight." Again, § 729, Comment g: "The buying habits of the purchasers of the particular goods in question are also significant. If the goods are bought by purchasers who exercise considerable attention and inspect fairly closely, the likelihood of confusion is smaller than when the goods are bought by purchasers who make little or no inspection." We are by no means sure that Life Savers Corp. v. Curtiss Candy Co., supra, 182 F.2d 4, is to the contrary; but, if it must be so construed, with great deference we must leave the last word to the Supreme Court.

Judgment affirmed.