**PERFECT FIT INDUSTRIES, INC.,**
Plaintiff-Appellant,

v.

**ACME QUILTING CO., INC.,**
Defendant-Appellee.

No. 155, Docket 79–7329.

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1979.

Decided Feb. 26, 1980.

Arthur H. Seidel, Philadelphia, Pa. (Roberta L. Jacobs, Seidel, Gonda, Goldhammer & Panitch, P. C., Philadelphia, Pa., Fink, Weinberger, Fredman, Berman & Lowell, P. C., New York City, on brief), for plaintiff-appellant.

John N. Cooper, New York City (Cooper, Dunham, Clark, Griffin & Moran, New York City, on brief), for defendant-appellee.

Before MULLIGAN, MESKILL and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Perfect Fit Industries, Inc. ("Perfect Fit") appeals from a judgment of the United States District Court for the Southern District of New York, Constance Baker Motley, *Judge*, entered for defendant Acme Quilting Co., Inc. ("Acme") after a bench trial, in this action for trade dress infringement brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), and the New York law of unfair competition. The amended complaint charged that Acme deliberately copied the trade dress which Perfect Fit had created for a new line of mattress pads. The district court agreed that there was deliberate copying, but denied relief on the ground that Perfect Fit had not shown that its trade dress had acquired secondary meaning. Since we conclude that on the facts shown, Perfect Fit was entitled to an injunction under New York law, we reverse in part and remand so that the district court may enter an injunction against further use of the infringing materials.

## I

Perfect Fit and Acme have manufactured and sold mattress pads for many years. Until several years ago, two styles of mattress pads were offered: in one style, the padding covered only the top of a mattress, and was to be fastened to the mattress by elasticised anchor bands; the other style was a contour-fitted pad in which, again, the padding covered only the top of the mattress, but was fastened to the mattress by netting on the four sides. These two types were usually packaged for sale in printed plastic bags. In May 1976, Perfect Fit introduced a new type of mattress cover which it called "BedSack," and which was contour-fitted and fully quilted—*i. e.*, the padding covered the top and the four sides of the mattress.

Perfect Fit also designed new packaging for its new product. Instead of the printed bag, it used a clear plastic bag into which

was inserted a printed piece of cardboard, called a J-board. The bottom portion of a J-board bends to a 90-degree angle over the end of the packaged product so that a portion of the board is visible to the prospective purchaser whether the packages are laid end-to-end on a table or stacked on a shelf. The dominant feature of the Bed-Sack J-board is a "high fashion" photograph of a blonde woman in night clothes, lounging at the head of a bed covered by a BedSack mattress pad. The photograph has a brown background, and is surrounded by an "art deco" frame in silver and gold, with a thin white border between the two colors. At the top of the frame there is a white BedSack logo in distinctive type face.

The BedSack was a popular success, and Perfect Fit's sales rose as a result. In the words of Acme's counsel at trial, "The product was hot."

Approximately four months after the BedSack was brought to market, Acme introduced its own contour-fitted, fully-quilted mattress cover, which it called "Bed-Mate."[1] To market its new product Acme, like Perfect Fit, turned to a clear plastic bag with a J-board. The first J-board used by Acme for its BedMate bears a strong resemblance to Perfect Fit's BedSack J-board. It consists of a "high fashion" photograph of a brown-haired woman in night clothes, lounging at the head of a bed covered by a mattress pad. The photograph has a brown background, and has an "art deco" frame in silver and gold, with a thin black border between the two colors. Just inside the top of the frame appears a white "Bed-Mate" logo, the lettering of which is similar in several respects to that used in the Bed-Sack logo. After using this BedMate J-board for a short time, Acme had the design slightly modified: the brown-haired woman was replaced by a blonde woman, a deeper brown background was used, and the words "The Original" were placed at the top of the "art deco" frame. The net result of these changes to the BedMate J-board was

---

1. Perfect Fit contests the district court's finding that only four months elapsed between the introduction of the two products, arguing that in fact, some seven or eight months had elapsed. Given our disposition of the case, we conclude that the difference is not material.

to make its resemblance to the BedSack J-board even more striking.[2]

Perfect Fit commenced suit on April 26, 1977. Its amended complaint, filed October 19, 1977, claimed that Acme's BedMate J-board infringed Perfect Fit's common law rights in its trade dress—specifically, in the BedSack J-board—and constituted a false designation of origin under § 43(a) of the Lanham Act.[3] Perfect Fit demanded injunctive relief, an accounting, and punitive damages.

At trial, Perfect Fit introduced evidence that Acme had deliberately copied Perfect Fit's J-board. The graphic artist hired by Acme testified, *inter alia*, that he had initially produced several designs of a J-board, none of which was acceptable to Acme; that an officer of Acme then gave him a Perfect Fit BedSack J-board, whereupon he designed the first BedMate J-board used by Acme; that in Acme's view the colors of this first J-board were not quite right, and that he thereupon designed the second J-board adopted by Acme, the colors of which were chosen by Acme and were closer to the colors of Perfect Fit's J-board; that he selected the type face for the Acme J-board from a book displaying one or two hundred type faces, and that his selection might have been a subconscious reaction to seeing the Perfect Fit J-board.

Perfect Fit also sought to prove that the BedSack J-board had acquired secondary meaning. This proof consisted solely of evidence of BedSack sales and advertising expenditures. No consumer surveys were offered, and no evidence was presented as to any instance in which a consumer actually mistook the BedMate for the BedSack.

After trial, the district court found that Perfect Fit's trade dress was "distinctive and memorable," and that the BedSack had become "very popular." It also found that Perfect Fit's and Acme's J-boards were "very similar," and "that Acme deliberately copied the insert being used by Perfect Fit." However, the court concluded that secondary meaning was a necessary element of a claim for relief under either § 43(a) or New York law, and found that Perfect Fit had failed to meet its burden of proof on the question of secondary meaning. The district court concluded:

> Since the court finds that Perfect Fit has failed to prove secondary meaning for its tradedress, the court need not reach the question of whether Perfect Fit proved that there was a likelihood of confusion between the two tradedresses.

■ Thus, the district court entered judgment for Acme. This appeal followed.[4]

## II

■ We conclude that under New York law, Perfect Fit was not required to prove secondary meaning in order to obtain relief from Acme's infringing trade dress. We also find that Perfect Fit made a sufficient showing of likelihood of confusion to warrant injunctive relief, but that it did not demonstrate entitlement to any other relief. We do not reach any of the other issues raised by the parties.

■ Secondary meaning was originally a trademark concept designed to limit the extent to which a manufacturer could monopolize words and symbols that are useful in describing products. The doctrine holds

---

2. The bottom of each J-board bore the name of its manufacturer in small print.

3. Perfect Fit's original complaint raised a single claim of copyright infringement, involving a pattern of quilting which Perfect Fit had developed for its mattress pads. After this claim was dismissed, Perfect Fit filed its amended complaint alleging trade dress infringement.

Perfect Fit does not assert in this proceeding any claim of trademark infringement with respect to its mark BedSack, any claim of copyright infringement with respect to its J-board,

or any claim of product simulation with respect to the mattress pads themselves.

4. Acme's answer to the amended complaint interposed four counterclaims, which remained pending after the dismissal of the complaint. Despite the fact that the judgment therefore was not "final," Fed.R.Civ.P. 54(b), so as to permit appeal pursuant to 28 U.S.C. § 1291 (1976), we have jurisdiction to hear the appeal under 28 U.S.C. § 1292(a)(1) (1976) since the judgment denied Perfect Fit's request for injunctive relief.

that a descriptive or geographical mark receives protection against copying only if consumers have come to associate it with a particular manufacturer or source. When this association is established and the mark has thus acquired secondary meaning, a second comer is barred from using it because such use is virtually certain to create confusion in the public mind as to the source of the product. *See* J. T. McCarthy, *Trademarks and Unfair Competition* § 15.3 (1973).

When a manufacturer employs marks that are not descriptive, however, there is less need to prevent their monopolization, for there is an unlimited number of nonfunctional words and symbols available for use by later comers in the marketing of their products. Similarly, monopolization is not a problem in the realm of trade dress, because the possible varieties of advertising display and packaging are virtually endless. Thus, in this area New York law has concerned itself principally with whether or not the public is likely to be confused, rather than with whether the first comer's trade dress has acquired secondary meaning. *See Feathercombs, Inc. v. Solo Prods. Corp.*, 306 F.2d 251, 258 (2d Cir.), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962); *Avon Periodicals Inc. v. Ziff-Davis Publishing Co.*, 282 App.Div. 200, 122 N.Y.S.2d 92 (1953), *aff'g* 27 Misc.2d 160, 113 N.Y.S.2d 737 (Sup.Ct.1952); *see also Noma Lites, Inc. v. Lawn Spray, Inc.*, 222 F.2d 716 (2d Cir. 1955); *International Latex Corp. v. Flexees, Inc.*, 281 App.Div. 363, 119 N.Y. S.2d 409 (1953); *Pharmaceuticals, Inc. v. United Whelan Corp.*, 22 Misc.2d 532, 197 N.Y.S.2d 22 (Sup.Ct.1959).

The teaching of these cases is that, in certain circumstances under New York law, an injunction will issue against confusingly similar trade dress, even though no secondary meaning is shown. In *Feathercombs*, for example, this Court stated as follows:

"It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of [his] competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." *Florence Mfg. Co. v. J. C. Dowd & Co.*, 178 F. 73, 75 (2 Cir. 1910).

"In this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2 Cir. 1960). . . .

Solo contends, however, that Feathercombs' display did not acquire any secondary meaning and that the finding of unfair competition should be set aside. The reply to this is that there is no need for the display combination to acquire an extraordinary meaning; it need merely be distinctive enough to become recognized as "a public guaranty of origin and quality."

306 F.2d at 257–58. *See also Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir. 1964), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965), in which this Court held that the defendant's use of the plaintiff's trademark constituted unfair competition despite the invalidity of the mark and despite the conclusion that the mark had not acquired secondary meaning:

[R]elief has been granted in New York in a wide variety of situations to insure that "one may not misappropriate the results of the skill, expenditure and labors of a competitor" . . . . A doctrine particularly developed in New York is that of granting relief upon the theory of the misappropriation of a property right or a commercial advantage of another . . . Particularly where the defendant's conduct has involved a clear attempt to profit at the expense of the plaintiff, . . . . New York courts have deemed the conduct to be unfair competition despite the

fact that plaintiff's mark has not acquired a secondary meaning.

*Id.* at 781–82.

In the present case, by dint of its own skill, efforts and expenditures, Perfect Fit had gained a commercial advantage over Acme. The district court found that Perfect Fit's trade dress was distinctive and memorable, and that the BedSack had become very popular. Acme clearly sought to nullify Perfect Fit's advantage by copying its trade dress. The finding that Perfect Fit had failed to show that its dress had acquired secondary meaning, therefore, should not have foreclosed inquiry into whether the public was likely to be confused by the similarity of the trade dresses.

 In assessing the likelihood of confusion to the public, an important factor is whether or not the second comer created the similar trade dress intentionally. If there was intentional copying the second comer will be presumed to have intended to create a confusing similarity of appearance and will be presumed to have succeeded. *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979); *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758–59 (2d Cir. 1960); *American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 562–63 (2d Cir. 1953); *G. H. Mumm Champagne v. Eastern Wine Corp.*, 142 F.2d 499, 501 (2d Cir.), *cert. denied*, 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944); *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 77 (2d Cir. 1934); *Bristol-Myers Co. v. Approved Pharmaceutical Corp.*, 149 U.S.P.Q. 896 (N.Y.Sup.Ct.1966); *Restatement of Torts* § 729, comment *f* (1938).

In *American Chicle Co. v. Topps Chewing Gum, Inc., supra*, Judge Learned Hand stated as follows:

[I]t is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is "likely" to succeed.

208 F.2d at 563. Judge Hand went on to quote from the *Restatement of Torts, supra*, which comments as follows:

[O]ne may infringe another's trade-mark or trade name by adopting a confusingly similar designation whether he does so innocently or for the purpose of deceiving prospective purchasers. But his knowledge or purpose is an important factor in determining whether or not his designation is confusingly similar. . . . [I]f he adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, his intent may be sufficient to justify the inference that there is confusing similarity. Since he was and is intimately concerned with the probable reaction in the market, his judgment manifested prior to the controversy, is highly persuasive.

 In the present case, the evidence and the district court's findings compel the conclusion that Acme's BedMate J-board was likely to confuse the public.[5] The finding that "Acme deliberately copied the insert being used by Perfect Fit," is amply supported by the evidence. Acme's artist testified that he tried several times before he had finally emulated the Perfect Fit J-board to Acme's satisfaction; Acme gave him a Perfect Fit J-board as a sample after his first efforts proved unacceptable. We further agree with the district court's finding that Perfect Fit's J-board was "distinctive and memorable," and that Perfect Fit's and Acme's J-boards are "very similar."[6] While there are some differences, such as

5. This conclusion is not altered by the district court's finding that after Acme copied the Perfect Fit J-board, Perfect Fit began to use, in addition to its original J-board, other, similar J-boards in supplying mattress covers to, for example, certain department stores.

6. Since this Court has been presented with photographs of the J-boards, it is in as good a position as the district court to determine whether they are confusingly similar. *Fur Information & Fashion Council, Inc. v. E. F. Timme & Son, Inc.*, 501 F.2d 1048, 1050–51 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974).

the pattern of stitching of the mattress cover and the color of the border between the gold and silver portions of the "art deco" frame, it is the "combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public." *Pharmaceuticals, Inc. v. United Whelan Corp., supra,* 22 Misc.2d at 534–35, 197 N.Y. S.2d at 25. Looking at the packaging as a whole, we conclude that the dress adopted by Acme is indeed quite similar to that of Perfect Fit. Given the fact that Perfect Fit's product was "hot," and given Acme's assiduous efforts to copy Perfect Fit's dress and to cause the public to believe that Bed-Mate was "the original," we reject any contention by Acme that public confusion was unlikely.

On the present record, therefore, Perfect Fit is entitled to injunctive relief against further use of the offending J-boards by Acme.

At the same time, it is clear that Perfect Fit did not make out a case for monetary relief. There was no showing at trial that the similarities in trade dress resulted in actual confusion of consumers. Perfect Fit offered to prove that various retailers had confused BedSack with Bed-Mate, advertising the latter while showing a picture of the former, or advertising the latter and seeking reimbursement therefor from Perfect Fit. These offers were properly rejected since none of the proffered exhibits involved the use of the J-boards or the J-board designs, and there was no proof that the retailers' confusion derived from the similarity of the J-boards. Even had Perfect Fit adduced admissible evidence of confusion on the part of retailers, however, such evidence would not have shown actual confusion of the public but only the likelihood of such confusion. In the absence of proof of actual confusion of consumers, Perfect Fit is not entitled to damages or an accounting. *G. H. Mumm Champagne v. Eastern Wine Corp., supra.*

Accordingly, we affirm so much of the district court's decision as denied the claim for an accounting and damages, but reverse the judgment dismissing the complaint and remand so an injunction may be entered.