GRUNER + JAHR USA PUBLISHING, A DIVISION OF GRUNER + JAHR PRINTING AND PUBLISHING CO., Plaintiff,

v.

MEREDITH CORPORATION, Defendant.

No. 92 Civ. 0636 (WK).

United States District Court, S.D. New York.

July 14, 1992.

David B. Wolf, Eric Stenshoes, Walter, Conston, Alexander & Green, P.C., New York City, for plaintiff.

Robert M. Callagy, Jan R. Uhrbach, Satterlee, Stephens, Burke & Burke, New York City, for defendant.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

Plaintiff alleges claims of trademark infringement, tradedress infringement, and unfair competition arising from the use of allegedly similar magazine titles. *See* Compl.; 15 U.S.C. § 1114; 15 U.S.C. § 1125(a). More particularly, plaintiff contends that defendant's publication of a magazine under the title "Ladies' Home Journal Parent's Digest" infringes rights plaintiff has to the mark "Parents". On February 26, 1992, plaintiff moved for a preliminary injunction. Upon consent of the parties, this motion was consolidated with the trial on the merits for permanent injunctive relief, *see* Fed.R.Civ.P. 65(a)(2); and on April 20 and 21, the matter was tried before the court. For the reasons that follow, we find that plaintiff is not entitled to injunctive relief.

## BACKGROUND

Plaintiff is the publisher of a magazine entitled "Parents", which is devoted to the field of articles on child-rearing. This magazine is published on a monthly basis, sells for the newsstand price of $1.95, and is recognized as having the largest circulation and the greatest advertising revenues of any magazine in its field. Approximately ninety percent of "Parents" circulation is attributable to its subscription sales, however it also has the largest newsstand sales of any child-rearing magazine. In 1991 plaintiff yielded gross revenues of approximately $24,700,000, and charged $49,000 per page of advertising space.

Plaintiff had begun publication of its magazine in 1926.[1] In 1937 the magazine was published on a monthly basis, and on August 24 of that year plaintiff was granted trademark registration for the mark "Parents' Magazine",[2] which it was then employing as the title of its publication. *See* Pl.Exh. 1. Throughout the course of the next forty-one years plaintiff published its magazine under that mark, and on August 24, 1977 its registration for that mark was renewed for the second time.[3] This 1937 mark is here reproduced as it appears on the certificate of registration:

# PARENTS'
### MAGAZINE

In 1978 plaintiff decided to "relaunch" its magazine to "give it a new life". Crow, Tr. at 211. To this end, it determined that the magazine's title should be shortened and printed in a new, different type face. *Id.* It then developed the "new logo" which is currently used on its magazine, and which is here reproduced:

# Parents

As is evident, this mark utilizes only the word "Parents", without an apostrophe. In addition it is printed in a serif typeface which was custom-designed for plaintiff. Crow, Tr. at 212; Hahn, Tr. at 56.

In 1979 plaintiff applied for, and was granted, trademark registration for this new mark on the Principal Register. *See* Pl.Exh. 2. Its application for said registration displays the mark in the exact manner here reproduced. *Id.* Since 1979 plaintiff has employed this mark on a variety of other products which it sells, including a series of paperback books on child rearing, a series of toys, and several other magazine publications including two spanish language magazines and a quarterly magazine entitled "Expecting". Since 1979 plaintiff has not used its 1937 mark in any manner, and the record contains no indication that plaintiff will—or reasonably could—ever use it again.

With respect to the use of the new mark "Parents" as the title of its child-rearing magazine, the mark is distinctive in the following additional ways: it is written in letters which are approximately two inches in height; the letters appear in a single line across the face of the magazine (with the initial "P" appearing in the upper left hand corner of the cover, and the final "s" appearing flush against the upper right hand margin); and the word "magazine" is transcribed in smaller capitalized print above the final "s" of "Parents". The following is typical of the manner in which this mark is displayed on the cover of plaintiff's magazine.

---

1. For ease of reference, we refer to the actions of plaintiff and its predecessor's as if they were committed by the same entity, namely plaintiff.

2. This registration was granted pursuant to Section 12(c) of the 1946 Act. *See* Pl.Exh. 1.

3. The renewal notice affixed to plaintiff's trademark registration states that it is valid for "20 years from August 24, 1977". *See* Pl.Exh. 1.

40-PAGE BONUS: VACATIONS FAMILIES LOVE

APRIL 1992

Parents MAGAZINE

Smart Ways To Use Rewards (Not Bribes!)

*See also* Appendix 1. The tradedress of the magazine is distinctive in that plaintiff routinely displays a full-face color photograph of a baby on its cover, and the cover is printed on glossy paper. In addition, on its Table of Contents page, it utilizes the caption "As They Grow" to introduce a series of articles which contain information pertaining to children ranging in ages one through 18. *See* Crow, Tr. at 174-5.

Sometime in 1986 a company known as Time Publishing Ventures, Inc. ("TPV") placed advertisements concerning its intent to publish a child-rearing magazine entitled "Parenting". *See* Pl.Exh. 33; Def.Exh. B. Prior to the publication of the first issue of this magazine, plaintiff was inundated with calls and correspondence demonstrating consumer confusion between it and this TPV publication. *See.* Crow, Tr. at 234-36; Def.Exh. B. Plaintiff informed TPV that it was considering bringing a trademark infringement action against it, and ultimately an informal settlement between plaintiff and TPV was reached. Crow, Tr. at 251. Defendant sought to introduce this settlement agreement into evidence, but plaintiff's objection was sustained. *See* Tr. at 3-14. To date consumer confusion between plaintiff and TPV's "Parenting" magazine appears to have diminished, with plaintiff receiving less than 100 letters or phone calls per month intended for TPV in early this year. *See* Crow, Tr. at 234; Cohen, Tr. at 94.

Defendant is the publisher the well-known monthly magazine, "Ladies' Home Journal", which is devoted to matters of general interest to women. During the past eight years, "Ladies' Home Journal" has dedicated certain sections of its magazine to topics on parenting, and routinely runs a column entitled "Parents' Journal". *See* Blyth, Tr. at 282.

In October 1991, defendant began publishing a separate magazine entitled "Ladies' Home Journal Parent's Digest", a collection of articles on child-rearing which have previously appeared in a variety of publications. This magazine is intended to be produced four times a year, and is sold on newsstands for $2.95. With the advent of this publication, the relevant field was expanded to five child-rearing magazines: plaintiff's, defendant's, "Parenting", "Child", and "Working Mother"; and another such publication entitled "Family Fun" has recently appeared. *See* Cohen, Tr. at 80.

Defendant testified that it decided to publish "Ladies' Home Journal Parent's Digest", which it terms a "satellite" publication, to provide incremental advertising pages to "Ladies' Home Journal". It explained that it charges $14,500/page for advertising space in this satellite publication, and offers a discount price of $7,500

per page to those who also purchase a $92,000/page ad in "Ladies Home Journal". Blyth, Tr. at 283, 292–3. It further testified that in deciding to create this magazine it believed it was offering the public a unique product, as no other known publication offered. a compendium of the best available materials on child-rearing. *Id.,*

Tr. at 284. Defendant asserts that it does not presently intend to sell this satellite magazine on a subscription basis. *Id.,* Tr. at 291–2. However, it seems wholly likely that an expansion into this market will eventually occur.

The title of defendant's magazine appears in the following manner:

*See also* Appendix 2. As is evident, the words "Ladies' Home Journal" appear in small type above the larger, more predominantly displayed "Parent's Digest", which phrase is divided into two lines.[4] In a manner similar to the appearance of the mark "Parents" on plaintiff's magazine, the initial "P" in defendant's "Parent's" is capitalized, and appears in the upper left-hand corner of the magazine's cover. However, unlike plaintiff's magazine, the word "Parent's" runs across only three-quarters of the face of the magazine; it is printed in letters approximately one inch high; the typeface is non-serif and shad-

owed; and the letters of the words do not overlap.

Defendant's tradedress is different from plaintiff's in that it employs an unusually large number of "cover lines" on the lower half of the magazine which span the entire width of the magazine. *See* Braren, Tr. at 135–6. However, in a manner similar to plaintiff's, defendant's magazine employs a child's face on the cover, and the cover is printed on glossy paper.[5] In addition, in its first publication, on its Table of Contents page, defendant utilized the caption "How They Grow" in a manner almost identical to plaintiff's use of "As They Grow" to intro-

4. Defendant informs, and indeed a comparison of its Premier issue and its Summer 1992 issue reveals, that in response to this action it doubled the size of that portion of its mark which displays "Ladies' Home Journal". For purposes of this action, we refer to the Summer 1992 magazine as representative of defendant's use of the mark "Ladies' Home Journal Parent's Digest". Examination of the actual magazine in evidence, rather than this black-and-white reproduction, discloses that the words "Ladies'

Home Journal", in a contrasting color, seem more significant in the original than in the copy.

5. The parties inform us that plaintiff's magazine is printed on 34 and 40 pound paper, whereas defendant's is printed on 50 pound paper. As we find no easily recognized difference between these two types of paper, we draw no conclusion from this characteristic.

duce articles pertinent to certain children's age-groups.

Defendant had full knowledge of the existence, successful reputation, and basic content of plaintiff's publication prior to launching its own publication. *See* Blyth, Tr. at 308–9.[6] When asked to explain why it chose the title "Ladies' Home Journal Parent's Digest", defendant testified that it did so because it felt this title was descriptive of the content of its publication. More particularly, it explained that it wanted "[t]o tell readers that [the publication] was a digest of material for parents"; and that it knew of no appropriate synonym for the word "parent".[7] Blyth, Tr. at 286–7. When asked why it chose to display the words "Ladies' Home Journal" in smaller print in the title, defendant stated that this decision was motivated in part by its desire to inform readers that the creator of the publication was "Ladies' Home Journal", and in part by its conflicting desire to prevent any purchaser from being confused into believing that it was purchasing "Ladies' Home Journal", which publication was simultaneously on sale in the newsstand. Blyth, Tr. at 294, 335. Defendant considered, but ultimately rejected, other designs for its magazine's logo, including several in which the word "Ladies' Home Journal" appeared in larger, more prominently displayed type. *See* Blyth, Tr. at 318, 321, 323. Defendant testified that its initial use of the topic-heading "How They Grow" was "absolutely done totally casually" and that this heading was abandoned when

plaintiff called attention to *its* similarity with plaintiff's "As They Grow". *Id.* at 333–4.

In some of its promotional literature for "Ladies' Home Journal Parent's Digest", defendant refers to this publication only as "Parent's Digest", *see* Blyth, Tr. at 312–13, and the words "Parent's Digest" appear next to the page number on some of the pages of the magazine with no reference to Ladies' Home Journal. *See id.;* Pl.Exh. 11, at p. 14. In letters defendant has received from readers of its magazine, the publication is occasionally referred to as "Parent's Digest", "Ladies' Home Journal", or "PD".[8] *See* Def.Exh. O. Although some of these letters compare defendant's magazine with that of plaintiff, in no instance has defendant received a communication, oral or written, which indicates confusion between its publication and plaintiff's.[9] *See* Blyth Tr. at 295–300.

To date two issues of defendant's magazine have appeared on newsstands. We were informed that the third issue, the Fall 1992 edition, was scheduled to go to the distributors late last month. At trial plaintiff produced expert testimony to support the conclusion that defendant's magazine is often displayed in close proximity to plaintiff's on newsstand shelves, and that newsstand displays generally reveal only the left side of a magazine's cover or its top portion. *See* Cohen, Tr. at 81–83; Braren, Tr. at 113. Plaintiff also introduced photographs which reveal how the parties' maga-

6. Myrna Blyth, the editor-in-chief of "Ladies' Home Journal" and the publishing director of "Ladies' Home Journal Parent's Digest", testified that she does not believe she had knowledge of plaintiff's use of the topic-heading "As They Grow" at the time the first issue of defendant's magazine was published. Blyth, Tr. at 331.

7. Defendant informs us that its research reveals that there are only thirteen words which are recognized as synonymous for "parent": genitor, matriarch, patriarch, ancestor, predecessor, progenitor, model, origin, source, generate, spire, spawn, nurture. Def.Post-trial Mem. at 43; *compare* Roget's International Thesaurus 71, 83 (1962).

8. The parties' stipulated that in a sampling of 79 letters: 21 people referred to defendant's maga-

zine as "Ladies' Home Journal Parent's Digest"; 8 referred to it as "Parent's Digest"; 30 used both of these titles interchangeably; 5 did not use any distinguishing name; and fifteen referred to the publication by some other nickname, including "PD" and "LHJ". *See* Tr. at 342.

9. At trial, defendant introduced evidence that in response to a survey published in the premier issue of its magazine, it received approximately 4,000 letters from readers, none of which indicated consumer confusion between its product and plaintiff's "Parents" magazine. Although these consumer letters were accepted into evidence, *see* Def.Exh. Q., we note that this survey did not contain a question which would solicit a response appropriate to the question of consumer confusion. *See* Tr. at 298–99.

zines were displayed on a particular day (April 8, 1992) in several newsstands in Manhattan.[10] These photographs are hereinafter referred to as Plaintiff's Exhibit 31. *See id.*, Tr. at 83–87. The following is typical of their content: [11]

Four of plaintiff's employees testified concerning instances of alleged actual consumer confusion between defendant's publication and plaintiff.[12] Marla Edelstein, the associate food editor at "Parents", testified that in September 1991, while browsing through a hotel gift shop, a colleague, who is the associate food editor of "Country Living", inquired as to whether "Ladies' Home Journal Parent's Digest" was the magazine for which Edelstein worked. Edelstein explained that earlier that day, when she first met this colleague, she had stated that she worked for "Parents" magazine. Edelstein, Tr. at 258–9. Francine Capra, the assistant to the food publisher at "Parents", testified that on each of two occasions, one in January and one in February 1992, she received a phone call in which the caller asked if plaintiff were the publisher of "Parent's Digest". Capra, Tr. at

263. Similarly, Amy Tuller, the production coordinator at "Parents", testified that once in March 1992 an advertiser asked her if plaintiff published "Parent's Digest". The fourth employee to testify, Carol Horii, creative director of plaintiff's magazine, stated that on April 14, 1992 she spoke with a former employee of plaintiff's, one John Seng, who stated with respect to defendant's publication, "I see you have some specials out". Horii, Tr. at 271–2. Horii also testified that on two or three other occasions, commencing in 1991 and continuing to the present, certain unidentified persons asked her, in substance, if defendant's magazine were one of plaintiff's publications. *Id.* at 272–3.

### The Parties Contentions

In support of its claim of trademark infringement, plaintiff contends that all of

---

**10.** The newsstand displays depicted include one in Grand Central Terminal, one in the Port Authority Bus Terminal, and one in the Pan Am building on East 44th Street.

**11.** It will be noted that in four of the nine pictures submitted as Plaintiff's Exhibit 31, the magazines are shown in a "full-cover" display, that is no portion of the cover is blocked by other magazines. However, according to the testimony of plaintiff's expert, such displays are unusual, as newsstand space is generally limited. Cohen, Tr. at 82–86; *see* Braren, Tr. at 113.

**12.** Initially plaintiff relied on the results of a survey, performed by Bruno & Ridgway, which it had commissioned in connection with this action to support its claim of consumer confusion. *See* Pl.Exhs. 15, 16. As plaintiff's own expert testified that he could not draw a conclusion based on the results of this survey as to whether or not there will be confusion between plaintiff's and defendant's magazines, for the reasons stated on the record at trial, we determined that the results of the survey were not probative of the questions before us. *See* Tr. at 166–8; *American Footwear Corp. v. General Footwear Co.* (2d Cir.1979) 609 F.2d 655, 663.

the *Polaroid*[13] factors weigh in its favor. Briefly summarized, plaintiff's position is that (1) its mark "Parents" is strong as shown by its long use and success; (2) defendant's title duplicates this mark; (3) defendant's magazine is in direct competition with plaintiff's; (4) there is some evidence of actual confusion; and (5) defendant's good faith is questionable, especially in light of its initial use of the topic-heading "How They Grow". Citing *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.* (2d Cir.1982) 687 F.2d 563, 567, *Perfect Fit Industries, Inc. v. Acme Quilting Co.* (2d Cir.1980) 618 F.2d 950, 953, and *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.* (2d Cir.1972) 470 F.2d 689, 692, plaintiff relies heavily on the general proposition of trademark law that a second comer to a market has a duty to name its product in a manner designed to avoid all likelihood of confusion with the product of the existing party, and any doubts concerning the similarity of the marks must be resolved against the second comer.

In opposition, defendant contends that the *Polaroid* factors tip in its favor. Although it concedes that plaintiff has achieved widespread secondary meaning for its logo "Parents", it contends that this secondary meaning is attributable to the logo and not to the word "parent". Accordingly, it urges us to conclude that "parent" is a descriptive term, and that in so far as plaintiff here claims rights to the mere use of said word the mark is extremely weak. Defendant further asserts that its use of the word "parent's" in the context of "Parent's Digest" is not similar to plaintiff's mark. With respect to the proximity of the products, defendant argues that there are significant differences between its magazine and plaintiff's, including differences in editorial content, newsstand sale price, price per page of advertising space, and the number of editions per year. *See* Def.Post–Trial Mem. at 25–28. As to proof of actual confusion, defendant contends that plaintiff's employees' testimony is largely inadmissable hearsay and hence there is simply no evidence of actual confusion. It further contends that in the instant circumstances, the absence of such evidence strongly supports the conclusion that it is unlikely that ordinarily prudent consumers will confuse or associate defendant's magazine with plaintiff's. Finally, defendant urges us to reject any inference that it did not act in good faith in adopting its title, asserting that it employed the word "parent's" because this term is descriptive and the "universe of possible titles" for a magazine of this nature is extremely limited.

## DISCUSSION

■ In order to grant injunctive relief, we must be persuaded that there is a substantial likelihood that defendant's use of its mark "Ladies' Home Journal Parent's Digest" will cause an appreciable number of ordinarily prudent consumers to be misled, or simply confused, as to the source of the goods in question. *See Lang v. Retirement Living Pub. Co., Inc.* (2d Cir.1991) 949 F.2d 576, 583; *Western Pub. Co., Inc. v. Rose Art Industries, Inc.* (2d Cir.1990) 910 F.2d 57, 59; *Mushroom Makers, Inc. v. R.G. Barry Corp.* (2d Cir.1978) 580 F.2d 44, 47. Before turning to a discussion of the *Polaroid* factors, we make two preliminary observations.

■ First, we find that with respect to those consumers who are advertisers, *see Centaur Communications v. A/S/M Communications* (2d Cir.1987) 830 F.2d 1217, 1221–22, there is no possibility of confusion. *See Inc. Publishing Corp. v. Manhattan Magazine, Inc.* (S.D.N.Y.1985) 616 F.Supp. 370, 386–87, *aff'd without opinion* (2d Cir.1986) 788 F.2d 3 (noting that the sophisticated nature of the advertising business makes the prospect that this particular form of consumer will be confused virtually non-existent). It is unthinkable that any advertiser would invest a significant amount of money in purchasing space in a magazine without satisfying itself as to the identity of the publisher. This is particularly true where, as here, the price per page of advertising space in defendant's publication is at most $14,500, as

---

**13.** *Polaroid Corp. v. Polarad Electronics Corp.* (2d Cir.1961) 287 F.2d 492, 495.

compared to plaintiff's price of $49,000, and defendant approaches potential advertisers with the inducement that they can purchase a page of space at the discounted price of $7,500 if they also purchase space in defendant's well known monthly magazine, "Ladies' Home Journal", at $92,000 per page.

▪ Second, we find that the term "parents" is unquestionably descriptive. Plaintiff makes much of the fact that the Patent and Trademark Office ("PTO") accepted registration of the mark "Parents Magazine" in 1937 and contends that this mandates the conclusion that that office found the term to be non-descriptive, descriptive marks not having been registrable under the Trademark Act of 1905 regardless of proof of secondary meaning. Similarly, it argues that if the PTO had determined that the mark "Parents"—as displayed in plaintiff's 1979 registration—was descriptive such registration would have stated on its face that the PTO relied on Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), which permits registration of descriptive marks only upon a showing of acquired distinctiveness. For present purposes we assume these statements to be true. However, fully realizing the deference which we are required to give to the determinations of the PTO, *see Playboy Enterprises*, 687 F.2d at 563; *20th Century Wear, Inc. v.*

*Sanmark–Stardust Inc.* (2d Cir.1984) 747 F.2d 81, 88–89, n. 8, we simply can not conclude that, as it is used as the title of a magazine dedicated to articles on child-rearing and addressed to persons having assumed responsibility therefor, the word "parents" is anything but descriptive.[14]

So stated, we turn to discuss the *Polaroid* factors which we find to be determinative of the question of likelihood of confusion. *See Thompson Medical Co., Inc. v. Pfizer Inc.* (2d Cir.1985) 753 F.2d 208, 214 (noting that "each trademark infringement case presents its own unique set of facts ... No single *Polaroid* factor is pre-eminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit").

### Strength of the Mark

▪ The strength of a mark "refers to its distinctiveness, 'or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source' ". *McGregor–Doniger, Inc. v. Drizzle Inc.* (2d Cir.1979) 599 F.2d 1126, 1131. As such, courts have routinely held that marks which are descriptive are weak. *See 20th Century*, 747 F.2d at 89; *Inc.*, 616 F.Supp. at 378; *National Information Corp. v. The Kiplinger Washington Edi-*

---

**14.** If this self-evident proposition needs support it can be found in the following: *20th Century*, 747 F.2d at 87 (the determination of whether or not a mark is descriptive "depend[s] upon the particular context of the mark's use, ... its time of use, and ... its group of users"); *Thompson Medical Co., Inc. v. Pfizer Inc.* (2d Cir.1985) 753 F.2d 208, 216 (finding that the mark "Sportscreme" as used as the name for a topical analgesic rub was descriptive, the court reasoned: "No exercise of the imagination is here necessary for the public to understand that the product is a cream useful in connection with sports"); *PaperCutter, Inc. v. Fay's Drug Co., Inc.* (2d Cir.1990) 900 F.2d 558, 563 (holding that the trademark "PaperCutter", for corporate name of manufacturer of paper ornaments, was descriptive, the Court noted that examples of descriptive terms include those which indicate "the class of intended purchasers" of a product); *Bernard v. Commerce Drug Co., Del Laboratories Inc.* (2d Cir.1992) 964 F.2d 1338, 1342 (citing with approval *Scholastic, Inc. v. MacMillan, Inc.* (S.D.N.Y.1987) 650 F.Supp. 866, 871, wherein

the district court found to be descriptive the mark "Classroom", as it was employed as the title of a magazine directed at teachers and students); *cf. In re Simulations Publications, Inc.* (C.C.P.A.1975) 521 F.2d 797, 799 (Rich, J. dissenting) (noting that magazine titles generally function as the means by which the contents of the publication are described).

Most recently in *Bernard, supra,* this Circuit reiterated the longstanding formulation that "[a] term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods". 964 F.2d at 1341 (finding the term "Arthricare", as applied to an arthritis rub, to be descriptive). The *Bernard* Court also noted that the conclusion that a term is descriptive may be bolstered by the concern that "exclusive use of the term might unfairly 'monopolize' common speech". *Id.* at 1342 (citation omitted). Taking judicial notice of the fact that "parents" is the word most commonly employed to refer to persons who have children, and that the universe of synonyms for this word is limited, we find such a concern here to exist.

*tors, Inc.* (D.D.C.1991) 771 F.Supp. 460 (finding that the mark "Personal Finance" as employed as the title of a newsletter was weak, on the ground that it is a term used by various publications to describe a generic type of information). As above noted, we find the term "parents" to be descriptive. In addition, we take judicial notice of the fact that the number of synonyms for this word is limited, *see supra* n. 14, and that this word enjoys extensive third-party usage. Accordingly, to the extent that plaintiff here claims right to the use of the mere word "parents", we find its mark to be extremely weak. *See Lang,* 949 F.2d at 581; *Plus Products v. Plus Discount Foods, Inc.* (2d Cir.1983) 722 F.2d 999, 1005.

Before addressing the second *Polaroid* factor, we wish to make one clarification. We do not question that plaintiff has established a high degree of secondary meaning between itself, as a company, and any product—including its magazine—on which it displays the "Parents" *logo.* However, we agree with defendant that the distinctiveness or " 'origin-indicating' quality in the eyes of the purchasing public" of this mark lies in the customized manner in which it is displayed, and not in the mere use of the word "parents".[15] *See Plus Products,* 722 F.2d at 1004. To the extent that plaintiff tries to rebut this conclusion by showing exclusive and continuous use of the non-stylized mark "Parent's Magazine" during the years 1937 through 1978, we note that it is undisputed that plaintiff has not used that mark since 1979, and it is inconceivable that any segment of the public—after the passage of thirteen years—maintains any association between plaintiff and that prior mark.

*Similarity of Marks*

In determining the similarity between the parties' marks, we must focus on the general impression conveyed to the purchasing public by the respective marks. *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.* (2d Cir.1985) 753 F.2d 14, 18. In resolving this question, we find Plaintiff's Exhibit 31 to be dispositive.

First, we observe that there can be little doubt that the only significant similarity between plaintiff's and defendant's titles is the fact that they both employ some form of the word parent. As discussed above, plaintiff's magazine's title is printed in a distinctive, stylized manner, which includes the very distinctive trait that the letters of the word "parents" overlap each other. In addition its title is spread across the full cover of its magazine. In contrast, defendant's title is printed in smaller, more "block-like", shadowed print; it consists of several words, none of which run across the full width of the magazine's cover. Although both publishers capitalize the first letter of the word "parent", and both magazines' covers are printed in glossy paper, a review of magazine covers in general leads us to conclude that these two traits are far from distinctive. *See* Pl.Exh. 31.

Although plaintiff correctly observes that defendant's title employs significantly smaller type to display the source-distinguishing words "Ladies' Home Journal", and that defendant uses the photograph of a child on its cover in a manner similar to plaintiff's tradedress, our review of Plaintiff's Exhibit 31 leads us to conclude that neither of these characteristics are likely to cause consumer confusion between the two products. According to plaintiff's own expert's testimony, *see supra* pp. 1227–28, the manner in which magazines are rou-

---

**15.** This finding could end the case. *See 20th Century,* 747 F.2d at 87–90; *Scholastic, Inc.,* 650 F.Supp. at 870–72. However, against the possibility of a reversal of either our determination that the mark "parent" is descriptive or our finding that plaintiff has failed to establish any secondary meaning between its magazine and the mere word "parent", we will assume for purposes of the remainder of this opinion that plaintiff's proof of the popularity of its magazine establishes the requisite secondary meaning to grant it a protectable interest in the word "parents". *See 20th Century,* 747 F.2d at 87, 90 & n. 10 (noting that if a mark is suggestive it is entitled to protection without proof of secondary meaning; and if it is descriptive, a plaintiff may meet its burden of showing secondary meaning with evidence of continued use or other evidence showing that the purchasing public associated the "phrase" with plaintiff's goods).

**1232**

tinely displayed at newsstands denies the potential purchaser visual access to a large part of the cover, and causes such purchaser to focus attention either to the left hand side of the magazine's cover, or to its upper portion. Exhibit 31 unmistakably demonstrates that in either case the words "Ladies' Home Journal" are clearly displayed as part of the title of defendant's magazine. Indeed Exhibit 31 reveals that the practice of blocking the lower·half or the right-hand side of the magazine's cover actually serves to heighten the importance of the words "Ladies' Home Journal" in defendant's title by increasing the percentage of the displayed visual space which these words occupy. Moreover, in both cases the photograph of the child's face is generally not visible or, if visible, can not be directly compared with the picture on the other's product.[16] *See Lang,* 949 F.2d at 581 (in evaluating the similarity of the marks, "a court should look at the general impression created by the marks, taking into account all· factors that potential purchasers will likely perceive and remember").

### Proximity of the Products & Bridging the Gap

With respect to the proximity of the products, we agree with plaintiff that this factor weighs in its favor. Although· defendant's publication costs more than plaintiff's and is a collection of previously published materials, it is undisputed that both parties' products are magazines of high quality dedicated to articles·on child-rearing, and concomitantly, that both appeal to the same, specialized class of consumers, namely persons of similar economic profiles who have children. In these circumstances we find that both the content and the market of the two products are closely competitive.

On the other hand, it can not be said that the parties' products are identical. The primary distinction between the two magazines is that defendant's is a collection of *previously* published articles. Although plaintiff's post-trial memorandum implies that plaintiff occasionally includes previously published articles in its magazine, *see* Pl.Post–Trial Mem. at 21, it has produced no evidence to support the conclusion that it has planned—or now plans—to expand its business to include production of the type of "digest" publication sold by defendant. Accordingly, we find that it is unlikely plaintiff will "bridge" this particular "gap".

### Actual Confusion

 Assuming *arguendo* that the testimony by four of plaintiff's current employees concerning actual confusion was properly admitted at trial despite proscriptions against hearsay, we nonetheless find that on the whole said evidence demonstrates only that certain persons thought to inquire as to whether or not a relationship between plaintiff and defendant existed, and not that such persons assumed that plaintiff and defendant were in any manner related.[17] As such, we deem it not probative evidence of actual confusion. *See Freedom Savings & Loan Asso. v. Way* (11th Cir.1985) 757 F.2d 1176, 1185; *Pump, Inc. v. Collins Management, Inc.* (D.Mass. 1990) 746 F.Supp. 1159, 1169; *cf. Lang,* 949 F.2d at 583 (trademark infringement protects only against mistaken purchasing decisions and not against confusion generally).

 Although the absence of proof of actual confusion may be a neutral factor, that is one which "neither helps nor hurts" plaintiff's case, *see Hasbro, Inc. v. Lanard Toys, Ltd.* (2d Cir.1988) 858 F.2d 70, 78, where, as here, both parties' publications

16. In addition, we note that Exhibit 31 reveals that the use of a child's face on the cover appears to be typical of the tradedress of all child-rearing magazines.

17. To the extent that Carol Horii's testimony concerning the statement by John Seng that he had assumed defendant's magazine was one of plaintiff's "special" publications may be con-

strued as evidence of actual confusion, we find that this testimony was improperly admitted. Plaintiff having suggested no reason why Mr. Seng was not available to testify, and given that his statements were offered to prove the truth of the proposition that he had confused plaintiff and defendant's publication, Ms. Horii's testimony should have been excluded as hearsay.

have been simultaneously on sale in news-stands for over six months and these products constitute approximately forty percent of the relevant "child-rearing magazine" market, we find that the absence of evidence of actual confusion weighs heavily against a finding of likelihood of confusion. See Western, 910 F.2d at 63; McGregor–Doniger, 599 F.2d at 1136.

### Good Faith

■ Although courts have routinely held that no single factor is determinative of whether or not there is likelihood of consumer confusion, see Thompson Medical, 753 F.2d at 214, any finding of bad faith on the part of a defendant would raise a presumption that its actions will indeed cause the confusion the defendant intended them to produce. See Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc. (2d Cir. 1960) 281 F.2d 755, 760; American Chicle Co. v. Topps Chewing Gun, Inc. (2d Cir. 1953) (Learned Hand, J.) 208 F.2d 560, 563. In urging us to make such a finding plaintiff cites, among other things, Judge Hand's famous observation in American Chicle, supra, 208 F.2d at 563:

> Indeed, it is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the "make-up" of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to

accept his forecast that he is "likely" to succeed. (emphasis supplied)

Here, the "reason" defendant can "assign" is obvious. Defendant's magazine is intended to address—and discuss the concerns of—men and women who, either by the necessity of nature or by choice, have assumed responsibility for nurturing young children. It would be difficult to find in the dictionary a word as appropriate for such a magazine as "parents". We therefore decline to draw any inference of bad faith from defendant's acknowledged effort to get as much mileage as possible from the descriptive word "parents" without impinging upon plaintiff's registered logo.[18]

The cases cited by plaintiff do not suggest a contrary conclusion. In Playboy Enterprises the Court found that the mark "Playboy" as it was employed as the title of a male-entertainment magazine, was a suggestive, not descriptive, mark. In so holding, the Court expressly noted that "[a]lthough the word may signify the aspirations of [the magazine's] readership, it does not describe the product or its contents". 687 F.2d at 566 (emphasis supplied). In like manner, in each A.T. Cross and Perfect Fit,[19] the Court was addressing instances where the mark at issue was not descriptive. Accordingly, it is apparent that in not one of those cases did the defendant have available to him the justification for coming "close to" plaintiff's mark which defendant here proffers.[20]

18. In so holding, we rely in part on our previously stated conclusion that the manner in which defendant determined to print the word "parent's" is not similar to the stylized design plaintiff employs for its mark. This, of course, raises the interesting question of what effect, if any, a reversal of that portion of this opinion would have on the merits of the remainder. See Playboy Enterprises, Inc., 687 F.2d at 566 (noting that although a "clearly erroneous" standard of review is applicable with respect to the district court's findings of fact which arise out of its judgement concerning the credibility of witnesses, "to the degree that the determination of likelihood of confusion rests upon a visual comparison of the marks and products themselves, the appellate court is in as good a position a the trial judge to decide this issue").

19. In Perfect Fit the Court was addressing a claim—brought under New York state law—of

tradedress, not trademark, infringement. That case involved a tradedress which was adjudged "distinctive and memorable". 618 F.2d at 952–54.

20. Notably, in both Playboy and A.T. Cross, the Court expressly affirmed the determination of the lower court that the defendant's stated reason for coming close to the suggestive or distinctive mark employed by the plaintiff was not credible. See Playboy, 687 F.2d at 566; A.T. Cross, 470 F.2d at 692, and n. 2 (noting that "defendant's explanation that the name La-Crosse was chosen [for its pen product] because of its association 'with the sport LaCrosse which is a very masculine, very rough sport' deserving association with 'a very masculine type of pen' ... seems exceedingly lame").

■ We therefore turn to plaintiff's contention that defendant's decision to utilize noticeably small print for the display of the words "Ladies' Home Journal" in its title evidences an intent to minimize the source-distinguishing impact of these words and to capitalize on plaintiff's good will. In light of the testimony of plaintiff's own experts as to the manner magazines are normally displayed and the visual evidence supplied by Plaintiff's Exhibit 31, *see supra* p. 1228, which establishes that the smaller print does not in actuality minimize the impact of the words "Ladies' Home Journal", we cannot infer the intention to produce confusion from the mere use of small print.

■ Finally, we cannot fault plaintiff for seizing upon the circumstance that defendant initially employed the topic-heading "How They Grow" in a manner almost identical to plaintiff's use of "As They Grow" as indicative of the possibility of bad faith. However, we conclude that the indication is insufficient to support a finding, and find we have no basis for rejecting defendant's testimony that the use of the heading "How They Grow" was the mistake of an underling and not a management decision. *See Resource Dev. v. Statute of Liberty–Ellis Island* (2d Cir.1991) 926 F.2d 134, 140–41 (noting that in determining bad faith defendant's state of mind is in issue); *Lang*, 949 F.2d at 583 (good faith "looks to whether the defendant adopted its mark with the *intention* of capitalizing on plaintiff's reputation and goodwill.."); *cf. American Chicle*, 208 F.2d at 563 (noting that one may "innocently" infringe another's trademark, the Court observed that the alleged infringer's purpose in adopting a confusingly similar designation is an important factor: "If he adopts his designation with the intent of deriving benefit from the reputation of the trademark :.. [of the plaintiff], his intent may be sufficient to justify the inference that there is confusing similarity").

## CONCLUSION

On balance we find that all, except one, of the relevant *Polaroid* factors tip in defendant's favor. Accordingly, we are not persuaded that defendant's use of the title "Ladies' Home Journal Parent's Digest" in the form exhibited on its Summer 1992 edition of its magazine—and set forth in Appendix 2—is likely to cause an appreciable number of ordinarily prudent purchasers to be confused, as that term is defined within the meaning of the trademark laws. We therefore deny plaintiff the injunctive relief it here seeks.

In addition to the claim of trademark infringement, the complaint asserts several other claims: unfair competition pursuant to 15 U.S.C. § 1125(a) and the common law of New York (Counts II and IV); and tradedress infringement pursuant to 15 U.S.C. § 1125(a) (Count III). It seems to us that the reasoning of this opinion disposes of all of these claims. However, since neither party has mentioned these matters in its brief, we direct the clerk to withhold entry of judgment for ten (10) days to allow plaintiff time to show cause why these claims should not be dismissed.[21]

SO ORDERED.

---

21. In the event plaintiff avails itself of this opportunity we shall call a conference to discuss what procedures should be followed. Failure to avail itself of this opportunity would in no way restrict the plaintiff in making arguments in support of those allegations in the event this decision should be reversed.