**NATIONAL INFORMATION CORP. and KCI Communications, Inc., Plaintiffs,**

v.

**The KIPLINGER WASHINGTON EDITORS, INC., Defendant.**

**Civ. A. No. 91–1596.**

United States District Court, District of Columbia.

Aug. 26, 1991.

George M. Borababy, Glenn T. Reynolds, Patton, Boggs & Blow, Washington, D.C., for plaintiffs.

Jeffrey Harris, Walter E. Diercks, Rubin, Winston, Diercks & Harris, Washington, D.C., for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This action comes before the Court for a hearing on plaintiffs' application for a preliminary injunction. Plaintiffs, National Information Corp., and KCI Communications, Inc. ("NIC" and "KCI"), seek to enjoin defendant the Kiplinger Washington Editors, Inc. ("Kiplinger") from using the trademark KIPLINGER'S PERSONAL FINANCE MAGAZINE. Plaintiffs contend that defendant's trademark violates plaintiffs' rights in its previously registered trademark, PERSONAL FINANCE. After oral argument, this Court is not satisfied that plaintiffs have satisfied their burden to prove a likelihood of success on the merits, and accordingly, their application will be denied.

*Background:*

Plaintiff KCI publishes *Personal Finance*, a financial investment advisory newsletter, which has been in continuous publication since October 1978.[1] Plaintiff NIC is the owner of three United States Trademarks, the first, obtained in 1978, for the mark PERSONAL FINANCE LETTER, and the second and third, obtained in 1989, for two versions of the mark PERSONAL FINANCE. All three marks are registered for use as the title of a newsletter. KCI, a wholly-owned subsidiary of NIC, is the only entity authorized by NIC to use these marks. *Personal Finance* is a 12–page publication which is billed as an investment advisory service. It is recognized as one of the leading financial newsletters in the field and has approximately 120,000 subscribers.

Defendant Kiplinger has been publishing various financial publications since 1923. In 1947, Kiplinger began a financial advisory magazine called *Kiplinger Magazine, the Changing Times*, which was renamed *Changing Times* two years later. By 1991, *Changing Times* had been under continuous publication for 42 years and had reached a circulation of 1.1 million. It is a

---

**1.** The newsletter was first published in 1976 by McGraw–Hill under the name *Personal Finance Letter*. In 1978, Mcgraw–Hill obtained the first trademark registration for the newsletter. It later assigned that registration and the newsletter to KCI.

general subject financial magazine, covering topics such as saving, investing, taxes, insurance, home ownership, travel, and consumer affairs.

In its August, 1989 issue, Kiplinger added the words "Kiplinger's Personal Finance Magazine" as an overline to *Changing Times*. In January, 1991, Kiplinger obtained a Trademark Registration for the mark KIPLINGER'S PERSONAL FINANCE MAGAZINE as a mark for "Periodical magazine concerning personal finance, investments, careers and consumers products and services." No claim was made to the exclusive right to use the term "personal finance." Kiplinger's application to register the mark PERSONAL FINANCE, THE KIPLINGER MAGAZINE, was rejected by the Patent and Trademark Office as being confusingly similar to NIC's registration for PERSONAL FINANCE.

The July, 1991 issue of Kiplinger's magazine was published under the name *Kiplinger's Personal Finance Magazine*. This name change was announced to advertisers before publication of that issue. Since the change, solicitations for subscriptions to Kiplinger's magazine have been sent out under the name

*Kiplinger's Personal Finance Magazine.*

Plaintiffs and defendant have had a friendly relationship during the past, occasionally sharing mailing lists and subscribing to one another's publications. When plaintiffs learned of Kiplinger's registration and the change in the name of Kiplinger's magazine, plaintiffs advised defendant of the belief that there would be confusion between plaintiffs' and Kiplinger's respective publications. At first, the parties attempted to resolve the dispute through informal discussions. Plaintiffs suggested to defendant various stylistic changes which would emphasize the word "Kiplinger" and thus play down the similarity between the titles of the two publications.

The last meeting between the parties, on June 17, 1991, failed to yield a compromise, and on June 28, 1991, plaintiffs filed this action, seeking a preliminary injunction to enjoin Kiplinger's alleged infringement of plaintiffs' rights in their trademarks PERSONAL FINANCE LETTER and PERSONAL FINANCE. Plaintiffs request that defendant be enjoined from using the mark KIPLINGER'S PERSONAL FINANCE MAGAZINE or any mark similar to plaintiffs' PERSONAL FINANCE as the title for a magazine, newsletter, or other financial publication.

*Discussion:*

In order to grant an application for a preliminary injunction, the Court must find that each of the following factors is satisfied:

(1) Plaintiffs have shown they are likely to prevail on the merits of the underlying action;

(2) Plaintiffs have shown they will be irreparably injured without the interim relief they seek;

(3) Plaintiffs have shown that defendant will not suffer substantial harm if the interim injunctive relief is granted.

(4) Plaintiffs have shown that the grant of interim relief is in the public interest.

*Washington Metropolitan Area Transit Commission v. Holiday Tours*, 559 F.2d 841, 843 (D.C.Cir.1977).

■ Plaintiffs have failed to persuade this Court that they are likely to succeed on the merits. Plaintiffs' infringement action essentially rests on the theory that the title of Kiplinger's magazine is susceptible to confusion in the marketplace with their own publication. *See Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir.1983). The Lanham Trademark Act states that if one uses a mark in commerce which "is likely to cause confusion, or to cause mistake, or to deceive . . . [one] shall be liable." 15 U.S.C. § 1114(1). It is plaintiffs' burden to demonstrate the likelihood that "an appreciable number of ordinary prudent consumers are likely to be misled, or simply confused, as to the source of the goods in question." *Sears, Roebuck & Co. v. Sears Financial Network*, 576 F.Supp. 857, 861 (D.D.C.1983) (citations omitted). This Court, having viewed the evidence and heard oral argument in this

action, finds that confusion between the two publications is unlikely.

■ In assessing the likelihood for confusion, a court must assess a variety of factors. Commonly used to evaluate the likelihood for confusion are the strength of plaintiffs' mark; the degree of similarity between the two marks; the proximity of the products; the likelihood that the plaintiffs might expand into the product offered by defendant ("bridge the gap"); evidence of actual confusion; the good faith of the defendant in adopting the mark; the quality of defendant's product; and the sophistication of the relevant consumer market. *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2nd Cir.1961) *cert. denied* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This list is not exhaustive and it is within the Court's discretion to evaluate the relevant factors as they appear in the particular case. *Beer Nuts,* 711 F.2d at 940.

1. Strength of Plaintiffs' Mark:

■ The strength of a mark refers to its distinctiveness or its tendency to identify the goods sold under the mark as emanating from a certain source. *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2nd Cir.1979). Registration is not sufficient to make a mark "strong." While the mark PERSONAL FINANCE has been used and registered by plaintiffs' for over 13 years, it is a term used by various publications to describe a generic type of information. There are newspaper columns and sections, radio programs, books, and a credit company that all use the term in their titles. Plaintiffs have provided no evidence that the term "personal finance" has become specifically associated with their newsletter.

The relevant consumer group is made up of potential purchasers of Kiplinger's magazine and plaintiffs' newsletter. This group would include newsstand purchasers. Plaintiff has been unable to establish that the term "personal finance" has become associated exclusively in the public's mind with plaintiffs' *Personal Finance* newsletter. Because the term "personal finance"

is used generically and has been widely employed in a variety of business writings, the mark PERSONAL FINANCE is judged to be relatively weak. *See C.L.A.S.S. Promotions v. D.S. Magazines, Inc.* 753 F.2d 14, 17 (2nd Cir.1985).

2. Similarity of Marks:

The evidence simply fails to support plaintiffs' assertion that the marks are confusingly similar. Kiplinger's mark features the name Kiplinger as the first word—a name which is widely recognized and which serves, by itself, to differentiate the two marks. Furthermore, Kiplinger's mark clearly includes the word "magazine," thus distinguishing it from plaintiffs' mark, which includes the word "letter" and is used exclusively for its newsletter. Defendant has not overemphasized the term "personal finance" so as to cause confusion with plaintiffs' mark; instead, defendant's mark clearly indicates that it emanates from a different source and describes a different product.

The fact that both marks include the term "personal finance" is simply not enough to render the marks overly similar. The phrase has been used as a section title by the *Wall Street Journal* and as a column heading by *The Washington Post;* it is used in book titles, and most importantly, it is used generically by the general public. This Court finds that neither the relevant trademark case law nor the plain evidence of the two marks supports a finding of similarity. *See e.g., C.L.A.S.S.,* supra; *Andy Warhol Enterprises, Inc. v. Time Inc.,* 700 F.Supp. 760 (S.D.N.Y.1988); *National Geographic Society v. Conde Nast Publications, Inc.,* 687 F.Supp. 106 (S.D.N.Y.1988) (*Conde Nast Traveller* deemed not to infringe on *National Geographic Traveller* if logos are sufficiently different and words "Conde Nast" clearly visible).

The size, layout, design and logotype of the two marks as used in the titles of the publications at issue demonstrate that any potential for confusion has been practically eradicated. Defendant's mark contains the word "Kiplinger's" printed in letters ap-

proximately twice the size of the term "Personal Finance Magazine." *Personal Finance,* plaintiffs' newsletter, displays only the words "personal finance" on the cover, and the print is smaller and of an entirely different design from defendant's logotype. *See C.L.A.S.S.,* 753 F.2d at 18.

The layout of the titles is also different. Plaintiffs' appears in the center of the cover on a boxed-in, colored background setting it off from the page. Defendant's title is placed in the upper left-hand segment of the cover under an overline, it is set along the left margin, and it is not set off from the rest of the cover. There is nothing to confuse these two marks in "the general impression conveyed to the purchasing public." *Id.* The speculation engaged in by plaintiffs about what might occur in the future does not support a finding that the marks are confusingly similar at present.

### 3. The Proximity of the Marks:

■ The inquiry into "proximity" addresses the concern whether the market and content of the two products are competitive, such that it is likely that consumers will confuse the source of the respective products. *Centaur Communications v. A/S/M Communications,* 830 F.2d 1217 (2nd Cir.1987). Again, the facts in this case demonstrate clearly that the "competitive distance between the respective magazines militate[s] against a finding of likelihood of confusion." *C.L.A.S.S.,* 753 F.2d at 18.

Plaintiffs' *Personal Finance* is a newsletter dealing with specialized stock market information. It is approximately 15 pages long and printed on uncoated paper. *Personal Finance* contains no advertisements. Its contents are generally short items recommending that readers buy or sell particular stocks. There are 120,000 subscribers to *Personal Finance,* which is published once a month and is available for $39 for a one-year trial and $78 for the full-rate subscription. The newsletter is not sold at newsstands but is sold exclusively with a direct mail sales brochure.

*Kiplinger's Personal Finance Magazine* is a full-color, magazine-format publication printed on glossy paper. The magazine, published monthly, tends to be about 40 to 50 pages long, and it contains advertisements in addition to numerous photographs and illustrations. Defendant's magazine features a wide variety of articles, many of which are only generally related to personal finance topics. Topics such as vacation planning, consumer issues, health and fitness, and child rearing, are featured. *Kiplinger's Personal Finance Magazine,* which is sold at newsstands and advertised through stamp sheets and the media, sells for approximately $2.50 an issue.

The editorial emphases are different, one publication serving a specific, highly specialized interest, the other a more general appeal magazine, aimed at a less select and sophisticated population. The readers of the two publications are not drawn primarily from the same populations. *Kiplinger's Personal Finance Magazine* is sold at newsstands and through stamp sheets. *Personal Finance* is available only by subscription which is solicited by direct mail. While there may be some minimal overlap in readership, the different physical attributes and layouts of the magazines as well as their different means of circulation make the two publications clearly distinguishable. These differences, and the different reading audiences they attract, support a finding that there is no direct competition and little chance of confusion. *See Centaur Communications,* 830 F.2d at 1226 (different editorial emphases alone "militate against a finding of proximity").

### 4. Bridging the Gap:

This inquiry involves the question of whether plaintiffs have planned at some point to expand, under their mark, into production of the type of product sold by defendant. There is no evidence that plaintiffs plan to expand into publishing a personal finance magazine.

### 5. Actual Confusion:

As plaintiffs informed this Court, even they "are not aware of any actual confusion that has resulted from the change in

the title of Defendant's financial advisory magazine." Pl.Mem. at 30.

## 6. Defendant's Good Faith and Intent in Adopting the Mark:

There is no question that defendant was aware of plaintiffs' mark and the title of plaintiffs' publication when the mark KIPLINGER'S PERSONAL FINANCE MAGAZINE was registered and used as the title of defendant's publication. Plaintiff voiced its concerns about the similarity of the marks to defendant before the name of the magazine was changed, and discussions ensued.

Plaintiffs' argument seems to be that this alone proves bad faith and an intent to capitalize on plaintiffs' reputation. Awareness alone, however, supports no more than an inference of bad faith. *Centaur Communications*, 830 F.2d at 1228 (citations omitted). This Court has found no evidence to support any such inference. The letters exchanged by the parties during discussions concerning the marks demonstrate that defendant made every effort to cooperate with plaintiffs' objections, despite defendant's repeatedly expressed opinion that the marks were not overly similar. In light of the facts that Kiplinger had been using the words "Kiplinger's Personal Finance Magazine" as an overline for *Changing Times* for some time and that the mark used by defendant was properly registered, the level of cooperation and goodwill displayed by defendant can simply not be characterized as "bad faith."

There is no evidence that defendant wished to take advantage of plaintiffs' goodwill through its name change. As explained above, the words "Kiplinger's Personal Finance Magazine" had already appeared on *Changing Times*. The name change seems to have been an effort to increase the advantage associated with the name "Kiplinger" rather than with the term "personal finance." In fact, the evidence supports the finding that the name change was motivated by the desire to have a title for the magazine which would indicate more specifically the nature of its contents.

## 7. The Quality of Defendant's Product:

Plaintiffs do not dispute that defendant's product is of the highest quality.

## 8. The Sophistication of the Consumers:

The more sophisticated the consumers of the relevant products, the less likely it is that a court will find likelihood of confusion. This is especially true where, as here, neither the marks nor the products are identical. *Id.* Plaintiffs attempt to show that the readers will not exercise much care when selecting one of the two relatively inexpensive publications, and that they will opt for defendant's cheaper publication, which costs as little as $10 per year, over *Personal Finance*, which costs $39 per year, without paying much attention to the differences between the two publications.

The nature of these two publications alone tends to militate against this conclusion. The publications deal with personal financial issues and are purchased by consumers who take an active interest in how their money should be spent. Certainly such consumers would take the time to ensure that the publication they purchased contained the types of articles in which they were interested. It seems to this Court that consumers of such publications are likely to exercise far more care than that of the average news or fashion magazine buyer, notwithstanding the relatively low prices of the publications.

*Conclusion:*

For the above-stated reasons, this Court finds that there is no likelihood of confusion, and thus plaintiffs have not met their burden for the granting of a preliminary injunction. Nor is this Court convinced that the balance of hardships requires the granting of preliminary relief. There is no evidence that plaintiffs are harmed by Kiplinger's use of the mark KIPLINGER'S PERSONAL FINANCE MAGAZINE. To the contrary, injunctive relief would cause defendant grave injury. At the least, it would be required to rename its magazine and alter its publicity and advertising efforts.

This Court is simply not satisfied that plaintiffs have met their burden for obtaining a preliminary injunction. Accordingly, their application will be denied.