**METRO PUBLISHING, LTD., Plaintiff,**

v.

**SAN JOSE MERCURY NEWS, INC., Defendant.**

**Civ. No. 91-20605.**

United States District Court, N.D. California.

Jan. 25, 1994.

---

John I. Alioto and Margaret Mullin Weems, Alioto & Alioto, San Francisco, CA, for plaintiff.

Ina J. Risman, Edward P. Davis, Jr., Teresa M. Corbin, Pillsbury, Madison & Sutro, San Francisco, CA, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT; SCHEDULING SETTLEMENT CONFERENCE

SPENCER WILLIAMS, District Judge.

Plaintiff Metro Publishing, Ltd., (hereafter "Metro Publishing") produces a weekly tab-

loid called *Metro,* containing movie and restaurant reviews, detailed listings of upcoming entertainment events, a free personal advertisement section with a telephone response system, and a limited number of news and feature stories. Since May 23, 1985, *Metro* has carried a weekly column called "Public Eye," focusing primarily on local political gossip and intrigue. Metro Publishing has attempted to register the words "Eye" and/or "Public Eye" as trademarks, but has not been able to do so.

On June 7, 1990, Defendant San Jose Mercury News (hereafter "the Mercury News") began publishing a weekly tabloid called *eye.* Like *Metro, eye* contains movie listings, film and restaurant reviews, information about upcoming entertainment events and a personal advertisement section.

On September 11, 1991, Metro Publishing filed a Complaint with this Court alleging (1) trade dress and trademark infringement in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Complaint, ¶¶ 23–36; (2) monopolization and attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, Complaint ¶¶ 37–45; (3) unfair competition in violation of California Business & Professions Code § 17200, Complaint ¶¶ 46–51; (4) unlawful dilution of a trademark in violation of California Business & Professions Code § 14330, Complaint ¶¶ 52–56; and (5) below-cost pricing in violation of California Business & Professions Code § 17043, Complaint ¶¶ 57–60.

On September 19, 1991, this Court denied Metro Publishing's application for a preliminary injunction prohibiting the Mercury News from publishing or distributing *eye.* The Court specifically found that Metro Publishing's chances of success on the merits were poor, since (1) it is unlikely that consumers will be confused by the alleged similarities between *eye* and *Metro*'s trade dress, *see E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992); *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 613 (9th Cir.1989) (plaintiff seeking to recover for trade dress infringement under § 43(a)

of the Lanham Act must show that similarities in plaintiff's and defendant's product likely to confuse consumers); and (2) as a matter of law, the name of a newspaper column is not entitled to trademark protection.

The Ninth Circuit subsequently reversed, holding that "under appropriate circumstances" the title of a newspaper column may be entitled to trademark protection, and that this Court erred by holding to the contrary. *Metro Publishing v. San Jose Mercury News,* 987 F.2d 637, 641 (9th Cir.1993).

Metro Publishing subsequently filed a motion for reconsideration of this Court's preliminary injunction order in light of the Ninth Circuit's holding. This Court denied Metro Publishing's motion on the basis that (1) it had failed to demonstrate that the parties' shared use of the word "eye" was likely to confuse consumers, and hence it was unlikely that it would succeed on the merits of its trademark claim, *see E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992) (plaintiff must prove likelihood of consumer confusion in actions for trademark infringement under the Lanham Act) and (2) Metro Publishing was guilty of unclean hands. *See* July 12, 1993, Order.

The Mercury News now moves for summary judgment on Metro Publishing's allegations of (1) trademark infringement, (2) trademark dilution, and (3) unfair competition inasmuch as that allegation involves trademark infringement or dilution.[1] In addition, Metro Publishing has filed a cross-motion for partial summary judgment on the issue of trademark validity. For the reasons stated below, the Mercury News' motion for partial summary judgment is GRANTED in its entirety, and Metro Publishing's cross-motion for partial summary judgment is DENIED.

## LEGAL STANDARD

A party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its mo-

---

1. The Mercury News' motion also addresses Metro Publishing's trade dress claim. However, Metro Publishing withdrew this claim shortly after the Mercury News filed its motion. *See* Metro Publishing's Reply, filed August 31, 1993, at 21:9.

tion...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To sustain this burden, the moving party must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322, 106 S.Ct. at 2552. However, the moving party is not required to *negate* those portions of the nonmoving party's claim on which the nonmoving party bears the burden of proof. *Id.*

Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

The adjudication of a summary judgment motion is not a "trial on affidavits." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Credibility determinations and weighing of the evidence are solely jury functions. *Id.* at 255, 106 S.Ct. at 2513. Inferences drawn from underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)).

However, there may be no genuine issue of material fact if "the evidence is of insufficient caliber or quantity to allow a rational finder of fact" to find for the nonmoving party. *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513. And in some circumstances the factual context may render the nonmoving party's claim implausible, and the nonmoving party must come forward with "more persuasive evidence" to support the claim "than would otherwise be necessary." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

**2.** It became apparent during oral argument that Metro Publishing did not understand the Ninth Circuit's holding in *Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 641 (9th Cir. 1993). Accordingly, this Court provides the fol-

## DISCUSSION

### A. *Trademark Infringement*

In its Complaint, Metro Publishing alleges (1) that the words "Eye" and "Public Eye" are its trademarks and (2) the Mercury News infringed on its trademark by publishing the tabloid *eye*. Complaint, ¶¶ 30–36. The Court grants summary judgment in favor of the Mercury News on this claim for three reasons: (1) Metro Publishing has failed to raise a genuine issue of material fact as to the validity of its asserted trademark; (2) Metro Publishing has failed to raise a genuine issue of material fact as to whether consumers are likely to be confused by the parties' shared use of the word "eye;" and (3) Metro Publishing's action is barred by the doctrine of unclean hands.

### 1. *Validity*

■ A trademark is defined as "any word, name, symbol, or device, or any combination thereof ... used by a person ... to identify and distinguish his or her goods ... from those manufactured and sold by others and to indicate the source of the goods...." 15 U.S.C. § 1127. In this context, the "good" in question is not the "Public Eye" column, but rather *Metro* as a whole. *See Ex parte Meredith Publishing Company*, 109 U.S.P.Q. 426 (Comm'r Pat. & T.M.1956). Therefore, in order to prevail, Metro Publishing must prove that it has used its asserted mark to distinguish *Metro* from other publications moving in interstate commerce, not merely to distinguish the "Public Eye" column from other parts of its own publication. *Id.* To do this, Metro Publishing must show that it has "so advertised, promoted and advanced ... ["Public Eye" that] ... "readers have developed a conscious association between ... ["Public Eye"] and [*Metro*] and [Metro Publishing]." *Id.* Cases where readers associate the title of an article with the publication itself and its publisher are "the exception rather than the rule." *Id.*[2]

lowing summary: In its opinion, the Ninth Circuit held that (1) "under appropriate circumstances," the title of a newspaper article may be entitled to trademark protection; (2) such protection may exist even though the title has not

Notwithstanding the fact that Metro Publishing has printed its "Public Eye" column for almost nine years, and has distributed *Metro* to many thousands of readers on a weekly basis, the only evidence of reader recognition that it has been able to muster after over two years of litigation is four short affidavits, one of which is based largely on unsubstantiated hearsay statements made by unnamed declarants. *See* Kouzes Decl.; Raso Decl.; D. Teifeld Decl.; Keith Decl.[3] The only rational conclusion which a jury could reach based on this evidence is that a negligible percentage of *Metro*'s readers, for unknown reasons, associate the word "eye" with the *Metro* publication, though possibly not with Metro Publishing itself. Any assumptions that a jury might make regarding other readers would be pure speculation. This scant evidence of reader recognition would not support a jury verdict in favor of Metro Publishing. Accordingly, summary judgment is GRANTED in favor of the Mercury News on the issue of validity. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (summary judgment granted in favor of the moving party where "the evidence is of insufficient caliber or quantity to allow a rational finder of fact" to find for the non-moving party).

### 2. *Likelihood of Consumer Confusion*

■ In order to prevail on its trademark infringement claim, Metro Publishing must also prove that the Mercury News' use of its asserted trademark gives rise to a likelihood of confusion by the consuming public. *Metro Pub.*, 987 F.2d at 640 (citing *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992)). "A likelihood of confusion exists when consumers 'are likely to assume that a product or service is associat-

ed with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.' " *Id.* (citations omitted). The Ninth Circuit has developed an eight-part test to assess likelihood of consumer confusion: (1) the "strength" of the trademark; (2) proximity or relatedness of the goods; (3) similarity of the sight, sound, and meaning of the marks; (4) evidence of actual confusion; (5) degree to which marketing channels converge; (6) type of goods and degree of care consumers are likely to exercise in purchasing them; (7) intent of the defendant in selecting the allegedly infringing mark; and (8) likelihood that the parties will expand their product lines. *Id.* (citing *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992)). Because each factor is not necessarily relevant to every case, this list functions as a guide and is neither exhaustive nor exclusive. *Id.* (citation omitted). In considering whether to grant summary judgment on the issue of consumer confusion, "the [district] court must [not] evaluate the marks ... in the abstract, but rather 'in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase' of the products involved." *Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 860 (C.D.Cal.1985) (quoting *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985)).

■ District courts have had no hesitation in granting summary judgment in favor of a defendant on the issue of consumer confusion where, based on the undisputed facts, the plaintiff has failed to present a genuine issue of material fact for trial. *See, e.g., Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 860 (C.D.Cal.1985) ("Where ... [the relevant

---

been registered as a trademark; and (3) this Court had erred in its July 12, 1993, Order, when it held as a matter of law that the titles of newspaper articles are never entitled to trademark protection.

The Ninth Circuit did not hold that Metro Publishing's asserted "Public Eye" or "Eye" marks were entitled to trademark protection. Accordingly, Metro Publishing still bears the burden of proving that it has a valid, protectable proprietary interest in its asserted marks.

3. It is worth noting that this Court has already informed Metro Publishing that these affidavits, each of which was filed on September 18, 1991, were not sufficient to establish a "likelihood of success" in proving validity. *See* July 12, 1993, Order at 8:23–9:2. However, notwithstanding the fact that Metro Publishing has conducted extensive discovery in this case since July 12, 1993, it has failed to offer any supplemental evidence of reader recognition.

facts] ... can be discerned from uncontested evidence presented through affidavits and exhibits, the [district] court can determine likelihood of confusion as a matter of law without need for trial."). Based on the following discussion of the eight-part test for consumer confusion used in the Ninth Circuit, there is no genuine issue of material fact as to the likelihood of consumer confusion in this case.

### a. Strength of the Mark

"The strength or weakness of a mark is determined by its placement on a 'continuum' of marks from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful,' awarded maximum protection." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir.1992) (quoting *Nutri/System, Inc. v. Con–Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir.1987)). This Court has already determined that Metro Publishing's asserted mark is merely suggestive, *see* July 12, 1993, Order, at 5:24–27, and hence it does not merit the same degree of protection afforded strong marks under the *Gallo–Nutri/System* rubric.

Another court, when faced with a claim similar to Metro Publishing's, found that the mark "personal finance," when used as the title of a periodical, was weak. *See National Inf. Corp. v. Kiplinger Wash. Editors*, 771 F.Supp. 460, 463 (D.D.C.1991). It reasoned that "[t]he strength [or weakness] of a mark refers to its distinctiveness or its tendency to identify the goods sold under the mark as emanating from a certain source." Because the mark "personal finance" had been used in various newspaper columns and sections, radio programs, books, and by a credit card company, it was too common to be associated with a particular periodical. *National Information*, 771 F.Supp. at 463; *accord Gruner & JAHR USA Pub. v. Meredith Corp.*, 793 F.Supp. 1222, 1231 (S.D.N.Y.1992), *aff'd*, 991 F.2d 1072 (2d Cir.1993) (mark "parents" extremely weak due to extensive third-party use); *Andy Warhol Enterprises, Inc. v. Time Inc.*, 700 F.Supp. 760, 764 (S.D.N.Y.1988) (third-party use of the alleged mark relevant to likelihood of consumer confusion).

The court's reasoning in *National Information* is applicable and persuasive in the case at bar. The word "eye" appears in several media contexts. For example, CBS uses a stylized eye logo and airs programs entitled "Eye on L.A.,", the "Eyewitness News" in Los Angeles, and the nationally broadcast "Eye on America" evening news segment. In addition, the Mercury News has submitted a list of 188 instances where the word "eye" is used in the title of a newspaper or periodical, or in an interior column of a newspaper or periodical. Second Warren Decl., ¶¶ 2–3 and Exh. A; *see also* First Warren Decl. Finally, Metro Publishing admits that there are 114 federal registrations, 66 state registrations and 174 common law uses of the word "eye" in the print media and communications field.

Due to the commonness of the word "eye," it is unlikely that an individual consumer, when asked to tell what product source he or she associated with the word "eye," would answer "Metro Publishing." Furthermore, should Metro Publishing be given the degree of trademark protection afforded stronger marks, such as "Oldsmobile" or "Big Mac," it would essentially corner the market on the use of the everyday word "eye." Such a result would not only be counterintuitive, but it would also diminish economic competition by turning the word "eye," which is susceptible to many creative marketing uses, into forbidden fruit. Finally, it is worth noting that such a precedent would be rather damaging to Metro Publishing itself, as it might open the way for a lawsuit against them by the many businesses that began using the very common word "metro" long before Metro Publishing came into existence.

For the reasons stated above, even if Metro Publishing had a valid trademark interest in the word "eye," it would, at best, receive only the moderate degree of protection afforded weak marks.

### b. The Meaning and Visual Depiction of the Mark

The parties use the word "eye" to convey a different meaning. The Mercury News uses it as the title of its tabloid. Metro Publishing uses it as a nickname for its Public Eye

column, and as a personification of the article's "voice." Accordingly, consumer confusion is unlikely. *See Andy Warhol Enterprises, Inc. v. Time Inc.*, 700 F.Supp. 760, 765 (S.D.N.Y.1988) (holding that plaintiff's use of the word "interview" as the title of its publication and defendant's use of the word as a section heading were not likely to confuse consumers).[4]

The parties also visually display the word "eye" differently. The Mercury News prints it in lower-case, three-inch letters in the upper left corner of the cover of its tabloid in a special typeface which it developed. The words "San Jose Mercury News" are printed directly above the word "eye." *See National Inf. Corp. v. Kiplinger Wash. Editors*, 771 F.Supp. 460, 463 (D.D.C.1991) (consumers not likely to be confused where defendant's widely-recognized name is part of the title); *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582 F.Supp. 551, 557 (N.D.Ill.1984) (granting summary judgment in favor of defendant where defendant's name appeared on the allegedly infringing goods). Metro Publishing has never printed the word "eye" in *Metro*'s title block, in three-inch letters, or, prior to May 9, 1991, with a lower-case "e" or in the characteristic typeface used by the Mercury News. *See Gruner & JAHR USA Pub. v. Meredith Corp.*, 793 F.Supp. 1222, 1231–32 (S.D.N.Y.1992), *aff'd*, 991 F.2d 1072 (2d Cir.1993) (consumer confusion unlikely given differences in size, layout and capitalization of the marks and use of special typeface). In fact, although the evidence is disputed, there is no indication that the word "eye" appeared on the cover of *Metro* more than 20 times between May 23, 1985, and May 9, 1991. Of those instances, it appeared without the word "public" only four times: (1) on the May 5–11, 1988, issue, printed across the top in fairly small print: "Eye

Looks at the Boss, the Champ and the Kid (p. 5);" (2) on the July 21–27, 1988, printed in small text in the upper right corner: "Eye Investigates Bohemian Grove Prostitution Reports (p. 6);" (3) on the April 25–May 1, 1991, issue, in the lower left corner: "Eye Spies: Public Eye blows the lid on two secret agendas: a contemplated light rail line switcheroo and the move afoot to extend Redevelopment well into the next century (p. 14);" and (4) on the May 2–9, 1991, issue, in the upper right corner: " 'Eye' Tries [printed in large text] The Merc gears up its desperate bid to clone Metro (p. 8)." Bettinger Decl., Exh. A; Alioto Decl., Exhs. 21, 22, 30. In every instance except the last, Metro Publishing used the word "eye" to refer to the "Public Eye" column.

After May 9, 1991, Metro Publishing began using the word "eye" quite differently on its covers. The following testimony by Dan Pulcrano, a founding partner of Metro Publishing, explains this change: "In May 1991, I used the word "eye" on the cover of *Metro* in the style I suspected the Mercury News might use." Pulcrano Decl. ¶ 2, Alioto Decl., Exh. 31. Due to Pulcrano's decision, Metro Publishing printed the word "eye" on the covers of the following issues of *Metro* in large letters, with a lower case "e," in the typeface created by the Mercury News: (1) in the upper right corner of the May 9–15, 1991, issue: "Exclusively in Metro THE ORIGINAL eye Accept No Substitutes (p. 12);" (2) on the middle left side of the May 16–22, issue: "In This Week's eye: BONDA-MANIA! The Redevelopment Agency quietly finds another $275 million to spend (p. 10);" and (3) in the upper right area of the May 23–29, 1991, issue: "eye On Redistricting[:] Power brokers quietly redraw county's political map—and fall strangely silent when Eye pays a visit (p. 10)." Bettinger Decl.,

---

**4.** Metro Publishing asserts that *Metro* itself is known by the nickname "eye" among consumers. *See* (Corrected) Opp. at 24:22. However, it has offered only one consumer affidavit which even remotely supports this assertion. *See* Keith Decl. This affidavit is rather vague and is based primarily on hearsay.

The only other evidence which Metro Publishing has cited to this Court which comes near to supporting its assertion is the deposition of Dan Pulcrano, a founding partner of Metro Publish-

ing, in which he testifies that the word "eye" has become synonymous with *Metro* "in his mind." Pulcrano Depo. 346:15–17, Alioto Decl., Exh. 11. However, the things which may or may not be going on in Mr. Pulcrano's mind are of little concern to this Court. This Court's task in deciding this motion is to determine whether consumers are likely to be confused by the parties' use of the word "eye," not to delve into the subjective impressions and word associations of one of the parties' founders.

Exh. A; Plaintiff's Amended Statement of Undisputed Facts No. 27 (admitting as undisputed that "[o]n the *Metro* covers of the May 9–15, 1991, May 16–22, 1991, and May 23–29, 1991, issues, after it had learned of the Mercury News' planned publication, Metro [Publishing], for the first time in the history of the "Public Eye" column, used the word "eye" in all lowercase letters in a typeface identical to the Mercury News' planned *eye* logo."). Metro Publishing also printed the word "eye" on the cover of *Metro* in the Mercury News' special typeface on September 5, 1991, six days before this lawsuit was filed. Davis Decl., Exh. B, filed Sept. 18, 1991.

▉ Based on the evidence presented by Metro Publishing, there was little or no visual similarity between Metro Publishing's use of the word "eye" on the cover of *Metro* prior to May 9, 1991, and the Mercury News' subsequent use of the word on the cover of *eye*. Only after May 9, 1991, when Pulcrano decided to imitate the Mercury News' visual presentation of *eye*'s title, did the two tabloids' use of the word "eye" become visually similar. Any consumer confusion that resulted from Pulcrano's decision is his fault, and the Mercury News should not be held accountable for it.

Furthermore, the limited visual similarities between *Metro* and *eye*, when considered as a whole, can easily be attributed to the fact that they, along with other Bay Area tabloids, are both members of the same industry and genre. *See* Mitchells Decl., Exhs. 11–14 (containing copies of *SF Weekly*, the *San Francisco Bay Guardian*, *San Francisco Downtown* and *Pacific Sun*). The Mercury News should not be held accountable for similarities which are largely, if not completely, the result of industry standards.[5]

### c. Similarity in Marketing Channels

It is true that both *eye* and *Metro* are distributed free of charge through freestanding newspaper racks placed in similar locations throughout Santa Clara County. How-

ever, the racks used by each party are quite different in color, and clearly describe their contents. *Metro*'s racks are bright red, with the words "Metro," and "Santa Clara Valley's Weekly Newspaper" printed vertically in large white letters down the side. The words "eye" or "public eye" do not appear anywhere on the racks. The *eye* news racks are dark blue, and have the word "eye" and the San Jose Mercury News logo painted on them in large white letters. *See* Bettinger Decl., Exh. C (containing black and white photos of the news racks used by *eye* and *Metro*). Furthermore, although the exact numbers are disputed, many editions of *eye* are distributed as inserts in the Friday edition of the San Jose Mercury News.

In short, the similarities between the marketing channels of *eye* and *Metro* are no more similar than the marketing channels of any two newspapers serving the same metropolitan area. It is rather foolish that two periodicals should be considered to infringe on each other merely because they use distribution channels which are common in their industry.

### d. Care Used by Consumers in Acquiring the Product

Metro Publishing contends that because the two publications are free and are distributed in public places, consumers will not exercise much care in acquiring them, and hence confuse them. The Court rejects Metro Publishing's argument. Any consumer who even bothers to glance at the title block of the tabloid in question will immediately be able to see whether it says *eye* or *Metro*. Both titles appear in very large print.

Furthermore, perhaps the most important consumers, advertisers, will certainly exercise a great deal of care to determine what publication they are advertising in. *See Gruner & JAHR USA Pub.*, 793 F.Supp. 1222, 1229 (S.D.N.Y.1992), *aff'd*, 991 F.2d 1072 (2d Cir.1993) ("It is unthinkable that any advertiser would invest a significant amount of money in purchasing space in a

---

5. Metro Publishing asserts that the overall similarities between *Metro* and *eye* are not the result of the industry standard. *See* Plaintiff's Amended Statement of Genuine Issues in Opposition to

Motion for Partial Summary Judgment, No. 22. However, the examples of other tabloids presented by the Mercury News belies this assertion.

magazine without satisfying itself as to the identity of the publisher.")

### e. Evidence of Actual Consumer Confusion

Metro Publishing has submitted several declarations which it asserts provide evidence of actual consumer confusion due to the parties' shared use of the word "eye." The Court finds that this evidence is inadequate to raise a genuine issue for several reasons. First, many of the witnesses do not state whether they were confused due to the Mercury News' use of the word "eye," or merely by the similar visual, editorial and marketing traits which *Metro* and *eye* share as members of the same genre. *See* M. Teifeld Decl.; H. Teifeld Decl.; Rodriguez Decl.; Gaetano Decl.; Smith Decl.; Lambert Decl.; Bernardini Decl.

Second, many of Metro Publishing's declarations are merely statements by Metro Publishing employees that third parties told them that they had confused *eye* and *Metro*. *See* Pulcrano Decl., filed Sept. 18, 1991; Hanson Decl.; Cohen Decl., filed Sept. 18, 1991; Second Cohen Decl., filed May 5, 1993; Thomas Decl.; Lopez Decl. At least one court has rejected such evidence and granted summary judgment. *See Victory Pipe Craftsmen, Inc. v. Faberge, Inc.,* 582 F.Supp. 551, 558 (N.D.Ill.1984) (citation omitted) ("hearsay reports with respect to the likelihood of confusion, especially those originating with employees of the plaintiff, are incompetent as evidence."). Also, there is no indication in most of these declarations as to why the third parties were confused.

Finally, regarding the declarations which actually do suggest that the parties shared use of the word "eye" caused confusion, *see* Keith Decl. (based on hearsay reports of third parties), Kouzes Decl., D. Teifeld Decl., Raso Decl., another district court has held that "evidence of 'actual confusion' is only one of many factors to be considered by the court in determining the validity of a trademark claim, and a minor dispute as to this one factor cannot defeat a motion for summary judgment where the court finds, on the basis of uncontroverted facts and upon examination of all of the relevant factors, that no

'confusion, mistake or deception arising in the market' is likely." *Programmed Tax Systems, Inc. v. Raytheon Co.,* 439 F.Supp. 1128, 1132 (S.D.N.Y.1977) (granting summary judgment in favor of defendant); *see also Victory Pipe Craftsmen, Inc. v. Faberge, Inc.,* 582 F.Supp. 551, 558 (N.D.Ill.1984) (citations omitted) ("isolated or minor instances of actual confusion do not support a finding of likelihood of confusion"). In light of the overwhelming evidence that the similarities between the parties use of the word "eye" are not likely to confuse consumers, Metro Publishing's paltry evidence of actual confusion is inadequate to raise a triable issue.

### f. Proximity and Relatedness

This Court has already determined that the tabloid *eye* and the *Metro* article "Public Eye" are neither "competitive" nor "related" goods. *See* July 12, 1993, Order at 11:7, 1993 WL 266786; *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979). In reaching this holding, the Court noted that Metro Publishing's argument to the contrary "seems to confuse the relatedness of the *Metro publication* and the "eye" publication with the relatedness of the "Public Eye" column with the "eye" publication." July 12, 1993, Order, 11:7–9. Having drawn this distinction, the Court found that the "Public Eye" column and the *eye* tabloid were not related goods because: (1) the contents of the tabloid *eye* and the contents of the article "Public Eye" are entirely different—there is no indication that *eye* carries political editorials as a prominent feature, or that it has ever carried even one such article, and there is no doubt that a list of what movies were playing at the local theater would have no place in the "Public Eye" column; (2) the tabloid *eye* and the article "Public Eye" have a different editorial focus, the former seeking to present general entertainment news and commentary, the latter seeking to present information and editorial commentary on local political intrigue and other local gossip; and (3) because of the differences in their content, they also have a different target audience.

### g. Intent of the Defendant in Selecting the Allegedly Infringing Mark

Metro Publishing vigorously contends that the Mercury News' decision to name its pub-

lication *eye* was the result of an intentional scheme to eliminate Metro Publishing as a competitor. Their account of the events leading up to the Mercury News' decision to use the name *eye* are as follows: Metro Publishing began running the "Public Eye" column on May 23, 1985. It chose the name "Public Eye" because it would be associated in the reader's mind with "people in the limelight" and because it sounded like "private eye, private investigator." As early as August 29, 1985, the Public Eye column began referring to itself by the nickname "Eye."

On January 30, 1985, before the first issue of *Metro* had been published, a Mercury News employee, Bob Williams, sent a memo to Dean Bartee, the Mercury News' Senior Vice President of Sales and Marketing, suggesting that the Mercury News change its "This Weekend" section in order to "beat down the challenge" presented by *Metro*. Weems Decl., Exh. 18. A similar memo was sent on February 25, 1985. Weems Decl., Exh. 19. On April 29, 1985, however, the Mercury News concluded that it would lose substantial advertising revenue if it converted its Friday entertainment section to a tabloid. Weems Decl., Exh. 25.

In January 1990, the Mercury News' Deputy Managing Editor, David Yarnold, commissioned the consulting firm of Booz–Allen & Hamilton to prepare a growth strategy report for the Mercury News. Weems Decl., Exh. 28. The report indicated that the Mercury News revenues probably would not increase unless changes were made, and recommended "focused selling strategies against *Metro*." *Id.* , After a series of discussions among top Mercury News officials, the proposal to convert the Mercury News' entertainment section to a tabloid was approved and slated for launch June 7[, 1991]. Weems Decl., Exh. 48.

Mercury News employees were invited to suggest names for the new tabloid. Seefeldt Depo. at 15:21–16:14, Alioto Decl., Exh. 12. The employee who submitted the winning name would win $50. Seefeldt Depo. at 27:13–20, Alioto Decl., Exh. 12.

Holly Hayes, the Deputy Features Editor, submitted the name "eye." Hayes Depo., 37:11, Alioto Decl., Exh. 5. She testified that she arrived at the name after a somewhat risque discussion about body parts. Hayes Depo., 36:11–37:12, Alioto Decl., Exh. 5. Hayes also testified that she was familiar with *Metro*, that she may have read its "Public Eye" column, but that she "didn't track on it being called ["Public Eye"]," and that her recommendation that the Mercury News' new tabloid be named "eye" had nothing to do with *Metro*'s "Public Eye" column. Hayes Depo., 37:13–38:8, Alioto Decl., Exh 5.

There is some confusion as to how the selection process proceeded from this point. According to Robert D. Ingle, his assistant, Helen Seefeldt, compiled a list of all the names which the employees had suggested. Ingle Depo. 439:2–440:13, Alioto Decl., Exh. 7. The list contained a large number of names, and the Mercury News employees were instructed to vote for their five favorite ones, ranked 1–5 in order of preference. Mercury News officials then selected several names from the list based in part on the results of the vote and discussed them during a meeting. The names "eye" and "Weekend" emerged as the "clear-cut choice[s]." After the meeting, Ingle decided that "Weekend" simply did not have enough of a—of an attitude about it to be the name and [the Mercury News was] going to call [its tabloid] "eye." Ingle Depo., 439:2–472:3, Alioto Decl., Exh. 7.

Based on the evidence presented by Metro Publishing, it is fairly clear that the Mercury News expended a fair amount of effort in devising its marketing strategy and launching its tabloid, and that its decision to do so was motivated at least in part by a desire to compete with Metro Publishing. However, there is no evidence showing that the Mercury News named its tabloid *eye* in order to confuse consumers and cause them to believe that it was produced by Metro Publishing. By arguing to the contrary, Metro Publishing is asking this Court to make speculative assumptions that are not warranted on the evidence. Although the Court must draw all reasonable inferences in favor of Metro Publishing, *see Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S.

654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)), the reasoning in which Metro Publishing would have the Court engage goes beyond reasonable inference.

### h. *Likelihood of Expansion*

Metro Publishing has offered no evidence that the Mercury News plans to expand *eye* or change its format in a way that would likely confuse consumers regarding its use of the word "eye."

### i. *Conclusion*

For the reasons stated above, there is no genuine issue of material fact as to the issue of consumer confusion. Accordingly, summary judgment is GRANTED in favor of the Mercury News on that issue.

### 3. *Unclean Hands*

In its July 12, 1993, Order Denying Plaintiff's Motion for Preliminary Injunction Upon Reconsideration, this Court found that Metro Publishing's decision to imitate the Mercury News' use of the word "eye," discussed in section 2(b) of this Order, "was a deliberate attempt to create confusion in the marketplace.... [which] may have created confusion where none would have existed [otherwise]," and, accordingly, that Metro Publishing was guilty of unclean hands. July 12, 1993, Order, at 13:2–5. Several courts have applied the equitable doctrine of unclean hands to bar actions for legal damages. *See Supermarket of Homes v. San Fernando Valley Bd.*, 786 F.2d 1400, 1408 (9th Cir.1986) (legal action for copyright infringement may be barred by unclean hands where copyright holder misuses copyright); *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 & n. 8 (4th Cir.1969) (where alleged infringer sought copyright holder's assistance to avoid infringing copyright, holder's failure to assist barred legal recovery due to unclean hands); *Buchanan Home & Auto Supply v. Firestone Tire*, 544 F.Supp. 242, 245 (D.S.C.1981) (footnotes omitted) ("Court opinions and commentaries since the procedural merger of law and equity in 1938 have expressed the view that the clean hands doctrine embodies a general principle equally applicable to damage actions, and that rights not suited for protection in equity should not be protected at law."); *McCormick v. Cohn*, 1992 U.S.Dist. LEXIS 21187 (S.D.Cal.) (action for damages due to copyright infringement, trademark infringement and unfair competition barred by unclean hands). Despite the fact that Pulcrano has subsequently testified that he did not have the specific intent to confuse the public, *see* Pulcrano Decl. ¶ 2, Alioto Decl., Exh. 31, it is undisputable that as soon as he learned of the Mercury News' plan to name its tabloid *eye*, he attempted to create a link between "Public Eye" and *eye* and capitalize on it. The reference to "Public Eye" as the "Original eye" on the cover of the May 9, 1991, issue of *Metro*, with the word "eye" printed in large letters in the Mercury News' special typeface, is a prime example. To allow Metro Publishing to create and exploit this link and then subsequently allow it to sue the Mercury News for damages because of it is completely inconsistent with traditional notions of equity and fairness. Accordingly, summary judgment in favor of the Mercury News is warranted on this basis alone.

### 4. *Conclusion*

Each of the three grounds discussed above, standing alone, warrants summary judgment. Accordingly, the Court GRANTS the Mercury News' motion for summary judgment as to Metro Publishing's trademark infringement claim.

## B. *Trademark Dilution*

In its Complaint, Metro Publishing alleges that the Mercury News' publication of *eye* diluted its alleged trademark in the words "Eye" and "Public Eye" in violation of California Business & Professions Code § 14330.[6] The Mercury News contends that it is entitled to summary judgment on this

---

**6.** California Business & Professions Code § 14330 provides as follows:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

claim because Metro Publishing's alleged mark is not distinctive or sufficiently well-known to qualify for protection under the antidilution statute. The only effort which Metro Publishing has expended in addressing the Mercury News' contention or sustaining its burden of showing that there are "specific facts showing that there is a genuine issue for trial," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324, 106 S.Ct. 2548, 2552, 2553, 91 L.Ed.2d 265 (1986), is its closing remark that "[t]he material facts underlying the determination of the other causes of action under which defendant moves overlap substantially, or are the same as, those for trademark infringement." (Corrected) Opp. at 28:9–11. Because there is little doubt that summary judgment in favor of the Mercury News on this claim is warranted given the undisputed facts, the Court need not spend much more effort on this matter the Metro Publishing has.

The Ninth Circuit has made it clear that the protection afforded by California's anti-dilution statute extends only to highly distinctive, well-known marks. *See Accuride Intern., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1539 (9th Cir.1989); *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793 (9th Cir. 1981); *see also Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 858 (C.D.Cal.1985) ("[t]he dilution doctrine is only available to protect distinctive marks as exemplified by such famous names as 'Tiffany,' 'Polaroid,' 'Rolls Royce,' and 'Kodak.'"). Metro Publishing's alleged "eye" mark is by no means as distinctive as the words "Polaroid" or "Kodak." Even if Metro Publishing had chosen to directly address this claim, it strains the intellect to imagine how it might have convinced the Court otherwise. Furthermore, if Metro Publishing were to prevail on this claim, the use of the innocuous, everyday word "eye" by others would become forbidden. Such a result would make little sense. *Accord Fruit of the Loom, Inc. v. Girouard*, 994 F.2d 1359, 1365–66 (9th Cir.1993) (holding that Fruit of the Loom, Inc.'s attempt to sue under the antidilution statute for use of the word "fruit" would cause "[t]he humble, humdrum word FRUIT [to be] barred from use by the Fruit Basket, The Fruit Gallery, the Fruit King, to name only three business-es currently listed in the San Francisco telephone directory. [Plaintiff] would sweep clean the many business uses of this quotidian word.").

Accordingly, the Court GRANTS the Mercury News' motion for summary judgment on Metro Publishing's trademark dilution claim.

### C. Unfair Competition as it Relates to Trademark Infringement and Dilution

Because the Court grants summary judgment in favor of the Mercury News on Metro Publishing's trademark infringement and dilution claims, it also GRANTS summary judgment in favor of the Mercury News on Metro Publishing's unfair competition claim under California Business & Professions Code § 17200, inasmuch as that claim is based on trademark infringement and dilution.

### CONCLUSION

Having carefully considered the relevant facts and law, the materials submitted by the parties, and the arguments of counsel, the Court hereby GRANTS the Mercury News' motion for partial summary judgment and DENIES Metro Publishing's cross-motion for partial summary judgment.